UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRADY TUCKER, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br> v.<br><br>CHASE BANK USA, N.A.,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601,** *et seq.*<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

Pursuant to Fed. R. Civ. P. 23, Plaintiff Brady Tucker brings this class action individually and on behalf of all other persons in the United States who, upon purchasing a cryptocurrency from Coinbase.com or another online crypto merchant, incurred cash advance fees and/or cash advance interest charges on consumer credit cards issued by Defendant Chase Bank USA, N.A. ("Chase" or "Defendant").  Plaintiff makes the following allegations based on the investigation of his counsel, and based upon personal knowledge as to himself and his own acts and dealings with the Defendant.  Plaintiff and his counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. In recent years, so-called "cryptocurrencies" such as Bitcoin, Litecoin, and Ethereum have gained public attention for their potential technological applications to the future of business and finance.  Many consumers view cryptocurrencies (or "cryptos") as a technology that could eventually help replace conventional, government-issued money.  As of today, however, cryptos are not money at all; they are a technology, mere computer programs stored on computers.  Cryptos are not created or issued by the U.S. government or any other government.  They are not issued or created by any regulated financial institution, nor are they recognized as legal tender in any foreign or domestic jurisdiction.

2. Nonetheless, many consumers have come to view cryptos as the future of money, or at the very least, the future of financial technology.  For that reason, some consumers have come to ascribe tremendous economic value to owning cryptos.  When and if cryptos become money in the conventional sense, some consumers want to be found owning them, largely because cryptos differ from conventional currency in one important respect.  Every type of cryptocurrency is programmed to be finite in number and ultimately fixed in supply.

1

3. Bitcoin, the first ever cryptocurrency, was released as open-source software in 2009 by an anonymous person, or group of persons, under the pseudonym "Satoshi Nakamoto." Since 2009, several other cryptocurrencies have been invented by various tech experts seeking to improve upon and/or offer alternatives to the Bitcoin concept. Some of the more popular cryptos available for public purchase include Litecoin, Ethereum, and Ripple. All have grown in notoriety and value over the last several years, as the concept of cryptos has spread from a fringe group of tech experts into the general public consciousness.

4. As the cryptocurrency wave began to propagate from a small segment of computer science gurus, into the media, and then to consumers at large, tech-savvy entrepreneurs saw an opportunity. On a largely *ad hoc* basis, entrepreneurs began to develop new technological and economic infrastructures to support the buying, selling and exchange of cryptos nationwide.

5. Among such "infrastructure" businesses was a now-prominent website called "Coinbase" (www.coinbase.com). Coinbase today serves as one of the largest cryptocurrency exchanges in the United States. Coinbase.com is owned and operated by San Francisco-based Coinbase, Inc., a privately held company that allows consumers to buy and sell cryptocurrencies using an intuitive, user-friendly online interface.

6. For the last several years, Coinbase has allowed consumers to purchase cryptos online using their personal credit cards. Throughout these years, Defendant Chase Bank USA, N.A. ("Chase" or "Defendant"), and other major banks, likewise permitted their credit card customers to purchase cryptos online. Whenever Chase's credit cardholders did so, Chase processed their crypto purchases from Coinbase and other merchants as ordinary credit card "Purchases."

2

7.     But beginning in January 2018, Chase decided to do something very different. Chase began treating all its customers' crypto purchases not as ordinary credit card "Purchases" — as Chase had for years — but instead as "Cash Advances" from Chase to the credit cardholder. When Chase implemented this change in late January 2018, Chase did so in total silence. Chase provided no prior notice to its cardholders that their crypto "Purchases" would be treated as "Cash Advances" on a going forward basis. All of this occurred unbeknownst to Chase's cardholders.

8.     Plaintiff and other Class members began using their Chase-issued credit cards to purchase cryptos in and before early January 2018, when their crypto purchases had always been treated as "Purchases." Plaintiff and other Class members had been using their credit cards to buy cryptos, not because they needed to borrow money in the first place, but instead because it was the only way to acquire cryptos *instantly* via Coinbase and other merchants. Purchasing cryptos with a bank account number would typically require several days of processing time. Consequently, consumers had long been using their credit cards to purchase cryptos simply to avoid unnecessary delays in delivery. For years, Chase consistently treated cardholders' crypto purchases as ordinary "Purchases" under Chase's card member agreements.

9.     As a result, in and after late January 2018, Plaintiff and the Class simply continued to do what they had been doing for years: making routine crypto purchases via Coinbase and other merchants using their Chase credit cards. Unbeknownst to Class members, however, they were now taking out personal cash loans from Chase, complete with new fees and sky-high interest rates (up to 30% annually). Those ultra-high finance charges began accruing *immediately* on the transaction date, rather than after the end of a billing period, as with an ordinary purchase. Based on Plaintiff's and the Class's longstanding experiences with Chase under their cardholder agreements, Plaintiff and the Class believed they could pay off their crypto purchases before their

3

credit card due-dates without incurring any finance charges. But Plaintiff and the Class were duped. Chase silently smacked them with instant cash advance fees, plus much higher interest rates than normal, and left them without any recourse.

10. In sum, the complete lack of fair notice to Chase's cardholders caused them to unknowingly incur millions of dollars in cash advance fees and sky-high interest charges on each and every crypto purchase. Chase's silent bait-and-switch squarely violates the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), which aims to ensure that consumers obtain credit from financial institutions based on their informed consent. Had Chase notified its cardholders, as required by law, in advance of making these changes to their credit card terms, Plaintiff and the Class would not have incurred millions of dollars in cash advance fees and interest charges by taking out personal cash loans from Chase ***without their knowledge or consent***.

11. Plaintiff and the Class seek, *inter alia*, a complete refund of all cash advance-related charges levied against them by Chase in connection with their recent crypto purchases.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. The claims asserted herein arise under and pursuant to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* and the United States Consumer Financial Protection Bureau's "Regulation Z" promulgated thereunder, codified at Title 12, Part 1026 of the Code of Federal Regulations.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Chase resides and transacts business in this District, and maintains its principal executive offices within this District. Many of the acts that constitute the violations of law complained of herein occurred in substantial part in this District.

## PARTIES

14. Plaintiff Brady Tucker is a resident of Idaho and has been a Chase credit card member since 2017. Mr. Tucker opened his Chase credit card account in or about June 2017. He made regular purchases of cryptos on Coinbase.com using his Chase-issued credit card beginning in early January 2018. Up until and including January 22, 2018, Chase treated all of Mr. Tucker's purchases on Coinbase.com as ordinary credit card "Purchases" under his cardholder agreement. But when Mr. Tucker made additional crypto purchases from Coinbase.com, using the same Chase credit card, on January 27, January 29, January 31, February 1, and February 2, 2018, Chase suddenly treated all of *these* purchases as "Cash Advances," and assessed at least $143.30 in cash advance fees and $20.61 in cash advance interest charges (as of February 20, 2018). Despite calling Chase's customer service line to complain about the surprise charges on his account, Chase declined to remove them. Plaintiff was forced to pay and did pay these surprise cash advance charges in full.

15. At no point did Chase attempt to notify Mr. Tucker — neither before nor immediately after he executed his latest crypto purchases — that such purchases would be treated as "Cash Advances" rather than "Purchases" under his card member agreement. Had Mr. Tucker known that Chase was going to begin treating his customary Purchases as Cash Advances, then Mr. Tucker would not have used his Chase credit card to buy cryptos on or after January 27, 2018, and would not have incurred or been forced to pay the cash advance fees and interest charges that Chase levied against him.

16. Defendant Chase Bank USA, N.A. is domiciled in New York and is one of the largest national banks and credit card issuers in the United States. In late January 2018, Chase

5

abruptly altered its customers' credit card terms — without notice — such that any crypto purchases made by card members would be treated as "Cash Advances" rather than "Purchases."

17.     From its own database records, Chase knew that many of its customers had long been using their Chase credit cards to purchase cryptos from Coinbase.com and other online crypto sellers.  In addition, Jamie Dimon, the Chief Executive Officer of Chase's parent company, JPMorgan Chase & Co., has repeatedly and publicly commented on consumer demand for cryptos.  For example, in September 2017, Mr. Dimon publicly announced his belief that Bitcoin is "a fraud": one that is "worse than tulip bulbs."  As for any employee he found buying Bitcoins, he added, "I'd fire them in a second.  For two reasons: It's against our rules, and they're stupid."[1]

18.     It appears that in addition to firing its "stupid" employees, Chase elected to start *fining* its "stupid" customers: unilaterally.  Chase made no effort whatsoever to notify its cardholders that they would begin incurring lofty cash advance fees and interest charges on all of their crypto purchases in real time.  During recent weeks, Plaintiff and other Class members have called Chase's customer service line to complain about Chase's surprise cash advance fees and interest charges.  When Plaintiff and other Chase cardholders have done so, Chase has responded by summarily (and deceptively) placing the blame on Coinbase.

19.     During recent months, several other major banks made similar changes to their customers' credit card terms, and began treating all crypto purchases as cash advances rather than ordinary purchases.  When credit card customers (many of whom are crypto consumers) of *other* major banks have called customer service lines to complain about a lack of prior notice, other

---

[1] *See, e.g.,* https://www.bloomberg.com/news/articles/2017-09-12/jpmorgan-s-ceo-says-he-d-fire-traders-who-bet-on-fraud-bitcoin ("Jamie Dimon Slams Bitcoin as a 'Fraud'").

major banks (unlike Chase) have voluntarily agreed to remove any surprise, crypto-induced cash advance fees.

## SUBSTANTIVE ALLEGATIONS

20. Chase is one of the largest national banks and credit card issuers in the United States. Chase issues a number of different credit cards to consumers nationwide, such as the Chase Freedom, Chase Sapphire, and Chase Slate credit cards, which differ primarily according to their "introductory offers" and "rewards" features. These include account-opening bonus offers, as well as other forms of compensation that vary according to a card member's spending levels. Chase also offers a series of "Chase Partner Cards," which are Chase-issued credit cards that offer vendor-specific rewards to a card member in proportion to his or her spending levels. For example, the Chase Marriott Rewards card allows its members to earn discounts on Marriott hotel stays, while Chase's Southwest Airlines Rapid Rewards credit card allows its members to accrue flight discounts over time.

21. As far as is relevant to this action, all Chase-issued, consumer credit cards come with substantially identical credit card member agreements. At all relevant times, each Chase card member agreement has set forth the applicable interest rates and fees (if any) that apply to different types of credit card transactions. Each agreement offers some variable annual percentage rate (or "APR") for ordinary "Purchases," and a substantially higher APR for so-called "Cash Advances."

22. At all relevant times, with respect to ordinary "Purchases," every Chase credit card agreement has stated: "You [the cardholder] may use your account to buy goods and services. We authorize charges to your account in accordance with the terms of this agreement." With respect to "Cash Advances," every Chase card member agreement has stated:

> You may obtain cash from automatic teller machines, at banks or
> by using cash advance checks [provided by Chase]. Unless we

7

> [Chase] say otherwise, balance transfer checks or promotional checks made payable to cash or yourself will be treated as cash advances. We treat certain other transactions as cash advances. See the Cash-like Transactions section under [the] Important Definitions [section] above.

23. Chase's "Important Definitions" section then defines "Cash-like Transactions" as follows:

> The following transactions will be treated as cash advances: purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions; purchasing lottery tickets, casino gaming chips, race track wagers or similar betting transactions; and making a payment using a third party service.

24. Based on all of the above language, Chase consistently and continuously treated Plaintiff's and all other card members' "crypto" purchases as ordinary "Purchases" up until late January 2018.

25. By way of example only, on January 15, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $360. Chase approved and processed this transaction as a standard "Purchase," and sent Plaintiff a credit card statement dated January 20, 2018 reflecting the same. Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

26. On January 16, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $120. Chase approved and processed this transaction as a standard "Purchase," and sent Plaintiff a credit card statement dated January 20, 2018 reflecting the same. Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

27. On January 17, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $90. Chase approved and processed this transaction as a standard "Purchase," and sent Plaintiff a credit card statement dated January 20, 2018 reflecting the same. Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

28. On January 20, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $273. Chase approved and processed this transaction as a standard "Purchase," and

8

sent Plaintiff a credit card statement dated February 20, 2018 (his subsequent monthly credit card statement) reflecting the same. Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

29. On January 21, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $120. Chase approved and processed this transaction as a standard "Purchase," and sent him a credit card statement dated February 20, 2018 reflecting the same. Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

30. On January 22, 2018, Plaintiff used his Chase credit card to buy cryptos from Coinbase for $101. As always, Chase approved and processed this transaction as a standard "Purchase," and sent him a credit card statement dated February 20, 2018 reflecting the same. Consistent with the longstanding terms of its card member agreements, Chase did not assess any "Cash Advance" fees or interest charges on this purchase.

31. On January 27, 2018, however, Plaintiff used his same Chase credit card to buy cryptos from Coinbase for $588. This time, without prior notice, and contrary to Chase's longstanding card member terms with Plaintiff and the Class, Chase approved and processed Plaintiff's crypto purchase as a *"Cash Advance,"* and hit Plaintiff with a surprise cash advance fee, as well as *instant* interest charges greater than 26% APR. Plaintiff's Chase credit card statement dated February 20, 2018 reflects the same.

32. On January 29, 2018, Plaintiff again used his Chase credit card to buy cryptos from Coinbase, this time for $245. Without notice, and contrary to Chase's longstanding card member agreements with Plaintiff and the Class, Chase approved and processed this transaction as a "Cash Advance" and hit Plaintiff with a surprise cash advance fee, along with immediate interest charges of over 26% APR. Plaintiff's credit card statement dated February 20, 2018 reflects the same.

9

33. On January 31, 2018, Plaintiff again used his Chase credit card to buy cryptos from Coinbase, this time for $122. Without notice, and contrary to Chase's longstanding card member terms with Plaintiff and the Class, Chase approved and processed this transaction as a "Cash Advance" and hit Plaintiff with a surprise cash advance fee, along with immediate interest charges of over 26% APR. Plaintiff's credit card statement dated February 20, 2018 reflects the same.

34. On February 1, 2018, Plaintiff again used his Chase credit card to buy cryptos from Coinbase, this time for $170. Without notice, and contrary to Chase's longstanding card member agreements with Plaintiff and the Class, Chase approved and processed this transaction as a "Cash Advance" and hit Plaintiff with a surprise cash advance fee, along with immediate interest charges of over 26% APR. Plaintiff's credit card statement dated February 20, 2018 reflects the same.

35. On February 2, 2018, Plaintiff again used his Chase credit card to buy cryptos from Coinbase, this time for $112. Without notice, and contrary to Chase's longstanding card member agreements with Plaintiff and the Class, Chase approved and processed this transaction as a "Cash Advance" and hit Plaintiff with a surprise cash advance fee, along with immediate interest charges of over 26% APR. Plaintiff's credit card statement dated February 20, 2018 reflects the same.

36. All told, Chase assessed a total of $143.30 in surprise "Cash Advance" fees against Plaintiff, along with $20.61 in surprise Cash Advance interest charges between January 27 and February 20, 2018 alone. At no point did Chase notify Plaintiff in advance of his transactions that Chase intended to begin — or had recently begun — assessing "Cash Advance" fees and interest charges on all of his and everyone else's crypto purchases. Instead, Chase simply stuck Plaintiff with the bill, after the fact of his transactions, and insisted that he pay it. Plaintiff called Chase's customer service line to dispute these fees and interest charges, but Chase refused to remove them,

10

so Plaintiff was forced to pay them and did in fact pay them in order to avoid further interest charges and/or delinquency.

37. Between January 2018 and February 2018 alone, Chase assessed the same surprise cash advance charges against hundreds if not thousands of other card members just like Plaintiff.[2] Plaintiff and the Class routinely purchased cryptos from Coinbase and other online crypto merchants, without knowing that Chase would assess hefty "Cash Advance" fees plus immediate interest charges of up to 30% APR. Had Plaintiff and the Class been notified of this in advance, as required by law, then they would not have continued using their Chase credit cards to purchase cryptos.

38. Chase's "gotcha" cash advance fees and interest charges against Plaintiff and the Class violate the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and Regulation Z promulgated thereunder by the CFPB. TILA and Regulation Z require credit card issuers, including Chase, to give their cardholders 45 days written notice *before* implementing any "significant change" to cardholders' credit card terms. 15 U.S.C. § 1637(i)(2). "Significant change[s]" expressly include cash advance fees, as well as any other finance charges that apply to different types of transactions. By not even attempting to notify (let alone effecting notice to) Plaintiff and the Class before assessing "Cash Advance" fees and interest charges against Plaintiff and the Class, Chase violated the letter and spirit of TILA and Regulation Z, which aim to "assure the meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(1).

---

[2] At some later point during February 2018, Chase began *declining* all of its card members' crypto purchases from Coinbase and other crypto merchants.

39. Had Chase notified Plaintiff in or before January 2018 of its abrupt change to Plaintiff's credit card terms, then Plaintiff would not have used his Chase credit card to buy cryptos, and would not have incurred or been forced to pay these "gotcha" fees and interest charges. Plaintiff seeks complete relief from these cash advance charges, on his own behalf and on behalf of all other Class members.

## CLASS ACTION ALLEGATIONS

40. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities in the United States who, upon purchasing a cryptocurrency from Coinbase.com or another online crypto merchant, incurred cash advance fees and/or cash advance interest charges on credit cards issued by Chase Bank USA, N.A. Excluded from the Class are Chase, the officers and directors of Chase, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Chase has or had a controlling interest.

41. The members of the Class are so numerous that joinder of all members is impracticable. Leading up to and during January and February 2018, hundreds if not thousands of Chase credit card members used their Chase cards to purchase cryptos from Coinbase.com and other online crypto merchants for millions of dollars, collectively. While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified and located from records maintained by Chase and may be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

42. Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law as complained of herein.

43. Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether Chase violated TILA by declining to notify Plaintiff and all other Class members in advance of Chase's sudden, unilateral change to their credit card accounts;

    b. whether Chase, in fact, failed or declined to provide Class members with advance written notice of Chase's sudden, unilateral change to their credit card accounts;

    c. whether Plaintiff and the Class suffered damages as a result of Chase's conduct, and the proper measure of such damages; and

    d. whether Plaintiff and the Class are entitled to statutory damages, as well as reasonable attorneys' fees and expenses as a result of Defendant's wrongful conduct.

45. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult if not impossible for members of the Class to

redress the wrongs done to them on an individual basis. There will be no difficulty in the management of this case as a class action.

**COUNT I**
**(Violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and Regulation Z Promulgated Thereunder)**

46. Plaintiff hereby repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

47. The Truth in Lending Act, at 15 U.S.C. § 1637(i)(2), requires credit card issuers to "provide a written notice of any significant change, as determined by rule of the [U.S. Consumer Financial Protection] Bureau, in the terms . . . of the cardholder agreement between the creditor and obligor, not later than 45 days prior to effective date of the change."

48. Pursuant to its express authority under 15 U.S.C. § 1637(i)(2), the Consumer Financial Protection Bureau ("Bureau") promulgated 12 C.F.R. § 1026.9(c)(2) which provides the following "Rules affecting open-end (not home-secured) plans," *i.e.*, credit card plans:

> (i) Changes where written advance notice is required.
>
> (A) General. For plans other than home equity plans . . . , when a significant change in account terms as described in paragraph (c)(2)(ii) of this section is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change ***to each consumer who may be affected***.

12 C.F.R. § 1026.9(c)(2)(i) (emphasis added). Section 1026.9(c)(2)(ii) then defines "Significant changes in account terms" as follows:

> For purposes of this section, a "significant change in account terms" means a change to a term required to be disclosed under § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.

12 C.F.R. § 1026.9(c)(2)(ii). The credit card account terms specifically enumerated in 12 C.F.R. § 1026.6(b)(1), (b)(2) and (b)(4) include, but are not limited to, the following:

> Transaction charges. Any transaction charge imposed by the creditor for use of the open-end plan for purchases.

12 C.F.R. § 1026.6(b)(2)(iv).

> Cash advance fee. Any fee imposed for an extension of credit in the form of cash or its equivalent.

12 C.F.R. §1026.6(b)(2)(vii).

> Type of transaction. The type of transaction to which the [interest] rate applies, if different rates apply to different types of transaction.

12 C.F.R. § 1026.6(b)(4)(i)(C).

49. By consistently treating Plaintiff's and the Class's crypto purchases as "Purchases" under its card member agreements, and not imposing cash advance fees or interest charges — then changing Plaintiff's and the Class's routine crypto "Purchases" to be treated as "Cash Advances" overnight in January 2018 — Chase made a "significant change" to Plaintiff's and the Class's credit card terms within the meaning of 15 U.S.C. § 1637(i)(2) and Regulation Z.

50. Upon making this significant, overnight change to Plaintiff's and the Class's credit card terms in January 2018, Chase did not provide advance written notice of the change as required by 15 U.S.C. § 1637(i)(2) and Regulation Z.

51. In the alternative, Regulation Z provides as follows:

> [I]f a creditor increases any component of a charge, or introduces a new charge, required to be disclosed under § 1026.6(b)(3) that is *not* a significant change in account terms as described in paragraph (c)(2)(ii) of this section, a creditor must either, at its option:
>
> (A) Comply with the [45-day notice] requirements of paragraph (c)(2)(i) of this section; or
>
> (B) Provide notice of the amount of the charge *before the consumer agrees to or becomes obligated to pay the charge*, at a time and in a manner that a consumer would be likely to notice the disclosure of the charge. The notice may be provided orally or in writing.

12 C.F.R. § 1026.9(c)(2)(iii) (emphasis added).

52. The credit card terms specifically enumerated in 12 C.F.R. § 1026.6(b)(3) include, but are not limited to, the following:

> For charges imposed as part of an open-end (not home-secured) [credit card] plan, *the circumstances under which the charge may be imposed*, [and] the amount of the charge or an explanation of how the charge is determined.

12 C.F.R. § 1026.6(b)(3)(i) (emphasis added).

53. Had Chase provided Plaintiff and the Class with advance notice of its changes as required by TILA and Regulation Z, then Plaintiff and other Class members would not have used their Chase credit cards to purchase cryptos from Coinbase and other merchants on or after the effective date of such changes. Consequently, Plaintiff and the Class would not have incurred Chase's surprise "Cash Advance" fees or interest charges, effectively taking out personal cash loans from Chase without their knowledge or consent.

54. Pursuant to 15 U.S.C. § 1640(a), Plaintiff brings this claim on his own behalf, and on behalf of the Class defined above, to recover his and the Class's actual financial damages, *plus* statutory damages in the aggregate amount of $1 million, *plus* his costs of this action and reasonable attorneys' fees and expenses incurred therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and the law firm of Finkelstein & Krinsk LLP as Class Counsel;

B. Requiring Defendant to pay the actual damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

  C. Awarding Plaintiff and the Class additional statutory damages in the aggregate amount of $1 million pursuant to 15 U.S.C. § 1640(a);

  D. Awarding Plaintiff and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation; and

  E. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 10, 2018      Respectfully submitted,

           FINKELSTEIN & KRINSK LLP

           By: s/ David J. Harris, Jr.
             David J. Harris, Jr., Esq.

           550 West C Street, Suite 1760
           San Diego, California 92101-3579
           Telephone: (619) 238-1333
           Facsimile:  (619) 238-5425
           Email: djh@classactionlaw.com

           *Counsel for Plaintiff and the Putative Class*
           (*pro hac vice* pending)