**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRADY TUCKER, RYAN HILTON and STANTON SMITH, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:18-cv-03155-KPF |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| v. | **(1) BREACH OF CONTRACT;** |
| CHASE BANK USA, N.A., | **(2) VIOLATIONS OF TRUTH IN LENDING ACT, 15 U.S.C. §§ 1601,** *et seq.***;** |
| Defendant. | **(3) DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201** |
| | **<u>JURY TRIAL DEMANDED</u>** |

Pursuant to Fed. R. Civ. P. 23, Plaintiffs Brady Tucker, Ryan Hilton and Stanton Smith bring this class action individually and on behalf of all persons in the United States who, upon buying a cryptocurrency from Coinbase.com or another online cryptocurrency merchant, incurred cash advance fees or cash advance interest charges on a consumer credit card issued by Defendant Chase Bank USA, N.A.  Plaintiffs make the following allegations based on the investigation of their counsel, and based on personal knowledge as to themselves and their own acts and dealings with Defendant.  Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Defendant Chase Bank USA, N.A. ("Chase" or "Defendant") is one of the largest credit card issuers in the United States.  Upon opening a consumer credit card account, Chase provides the consumer with a standard form, adhesive contract stating the terms under which Chase will extend credit to the consumer.  Among those contractual terms are the different types of credit card transactions that result in different finance charges.

2.      Chase's written contracts and account-opening disclosures to cardholders (the "Written Contracts") show that Chase will charge a particular interest rate for credit card "Purchases," and a higher interest rate for so-called "Cash Advances."[1]  "Purchases" and "Cash Advances" are defined terms under the Written Contracts.  The Written Contracts state that Chase will extend credit in the form of a Cash Advance in exchange for a transaction fee, the greater amount of $10.00 or 5% of the transaction amount.  Chase will also assess interest charges of more than 26% annually, which accrue daily on both the transaction amount and the transaction fee, beginning on the transaction date.

---

[1] Attached hereto as Exhibit A is a true and correct copy of one of Chase's standard form, Written Contracts provided to cardholders upon opening their credit card accounts with Chase.

3.      By contrast, Chase's Written Contracts provide that credit card "Purchases" come with no transaction fees and lower interest rates.  Chase begins charging interest on Purchases only (if ever) after a cardholder's payment due date has passed without the cardholder paying off their balance in full.  By paying one's entire account balance off before the payment due date, a cardholder can avoid paying any fees or interest charges on their Purchases, and many consumers often do this to avoid finance charges.  With Cash Advances, however, this frugal practice is not possible; the cardholder gets charged heavily, starting on day one of the transaction and continuing every day thereafter until the balance is paid in full.

4.      Plaintiffs and thousands of Class members have used their Chase credit cards to buy so-called "cryptocurrencies" (also called "virtual currencies" or "cryptos"), such as Bitcoin, Litecoin and Ethereum.  Chase's Written Contracts do not expressly address cryptos or the so-called "blockchain" technologies upon which cryptos operate.  The relevant language states that, "The following transactions will be treated as cash advances: purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions . . . ."

5.      As detailed herein, virtual currencies are neither "cash-like" nor "similar" to Chase's enumerated "cash-like" terms.  Virtual currencies are, in fact, fundamentally different from the types of transactions Chase enumerated as "Cash Advances" in its Written Contracts.  Virtual currencies are far more "similar" to digital goods and commodities, the buying of which are "Purchases" within the meaning of the Written Contracts.

6.      Beginning in 2016 or earlier, Chase routinely designated, disclosed, and charged Plaintiffs' and other Class members' crypto purchases as "Purchase" transactions under their Written Contracts.

7.      Coinbase, Inc. ("Coinbase") is one of the nation's largest crypto sellers, and for a time, was also a major credit card merchant. Coinbase is a privately held company that buys and sells cryptocurrencies to consumers through a user-friendly website, www.coinbase.com. Coinbase began allowing its customers to buy cryptos with credit cards in 2016.  From 2016 until and including January 22, 2018, Chase *correctly* deemed, and affirmatively disclosed and charged, these transactions as "Purchases" under its Written Contracts.  Chase assessed no transaction fees, and applied the same interest charges it applied for all other types of credit card Purchases. Plaintiffs made numerous crypto purchases during 2017 and early 2018, which Chase affirmatively designated, disclosed, and billed to them as "Purchases."

8.      Then, between January 23, 2018 and February 2, 2018 (inclusive), Plaintiffs bought more cryptos from Coinbase using their same Chase credit cards, under the same Written Contracts.  Chase *wrongly* treated all crypto transactions occurring between these dates as "Cash Advances": contrary to the plain language of its Written Contracts, and contrary to Chase's prior dealings with Plaintiffs and the Class.  Chase has assessed hundreds of dollars in surprise Cash Advance fees and interest charges against Plaintiffs, without any advance notice, and now refuses to undo them.  As detailed *infra*, Chase's acts and omissions violated the Written Contracts, the federal Truth in Lending Act ("TILA") and Regulation Z promulgated thereunder by the U.S. Consumer Financial Protection Bureau ("Bureau").

9.      As a direct and proximate result of Chase's wrongful conduct, Plaintiffs estimate that they and the Class have incurred millions of dollars in Cash Advance fees and interest charges on their Chase credit cards.  Their financial damages are quantifiable based on Chase's database records of the transactions and finance charges in question.  Plaintiffs and the Class seek, *inter alia*, a refund of all Cash Advance fees and interest charges levied against them by Chase for their

cryptocurrency purchases.  Plaintiffs and the Class further seek a declaratory judgment from this Court, clarifying the Class's legal obligations under the Written Contracts, once and for all.

## JURISDICTION AND VENUE

10.    With respect to Plaintiffs' claims under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, Regulation Z promulgated thereunder at Title 12, Part 1026 of the Code of Federal Regulations, and the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States.

11.    With respect to Plaintiffs' breach of contract claims, the Court has jurisdiction under 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and Plaintiffs and Class members are citizens of States different from Defendant.  If the Court determines it lacks jurisdiction over Plaintiffs' contract claims under 28 U.S.C. § 1332(d), then it may exercise supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Chase resides and transacts business in this District, and maintains its principal executive offices within this District. Many of the acts that constitute the violations of law complained of herein occurred in substantial part in this District.

## PARTIES

13.    Plaintiff Brady Tucker is a resident of Idaho and has been a Chase credit cardholder since 2017.

14.    Plaintiff Ryan Hilton is a resident of Indiana and has been a Chase credit cardholder since 2017.

15.     Plaintiff Stanton Smith is a resident of Colorado and has been a Chase credit cardholder since 2012.  Mr. Smith opened the credit card account that is the subject of this case in 2017.

16.     Defendant Chase Bank USA, N.A. is domiciled in New York and is one of the largest national banks and credit card issuers in the United States.

## SUBSTANTIVE ALLEGATIONS

### What is Money?

17.     In the most general of terms, money is a tool used to facilitate economic transactions.  Only those media of exchange which are readily accepted in exchange for goods, services, and real and financial assets are considered to be money.  Throughout the United States, money is composed of three kinds:

(a) currency (*i.e.,* paper money and metal coins in the pockets and purses of the public);

(b) demand deposits (*i.e.,* non-interest bearing checking account deposits in banks); and

(c) other checkable deposits, such as negotiable order of withdrawal accounts ("NOW" accounts) at depository institutions like banks, savings and loan associations, and credit unions.

While currency remains widely used for small transactions, most of the dollar amount of payments in the economy are made by check or by electronic transfers between deposit accounts.

18.     Under the domestic (and global) "fiat" currency system, monetary units defined by the government generally lack intrinsic worth.  A dollar bill is merely paper and ink, and a deposit is merely a book entry.  Thus, money has no real use case other than to serve as money.    The ultimate value and viability of fiat currencies, including the U.S. dollar and various foreign currencies, depend upon: (a) a government which has a sovereign monopoly over the provision of

its own fiat currency; and (b) the fact that such fiat currency is the only unit which is acceptable for payment of taxes and other financial demands of the government.

19.     Governments create money principally through the mechanism of a central bank: in the U.S., the Federal Reserve System, which interacts with public-facing depository institutions. The actual processes of money creation take place primarily in banks, with the major control over such processes resting in the central bank.  If one examines a piece of actual U.S. currency, such as a Series 2009 $20 bill, one can see evidence of both the "fiat" nature, and central bank origin, of our nation's currency.  It is labeled as a "Federal Reserve Note," displays the official seal of the United States Federal Reserve System, displays copies of the personal signatures of the Treasurer of the United States and the U.S. Secretary of the Treasury, and states, "THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE."

**What is a "Cryptocurrency" or "Virtual Currency"?**

20.     In short: not money.  Virtual currencies are not legal tender for *any* (let alone "all") debts, whether public or private.  Nor do virtual currencies represent claims on legal tender.

21.     The government does not accept payment for taxes or other obligations, such as traffic tickets or student loans, in "virtual currency."  The overwhelming majority of private businesses and individuals will also not accept payment for the sale of goods, services, or real or financial assets in "virtual currency."

22.     Importantly, no government has a sovereign monopoly on the creation of cryptocurrencies.  In fact, no *person* or entity has such a monopoly: or any control at all, for that matter.  Anyone can create their own cryptocurrency at any time, so long as they are sufficiently skilled at programming computers.

23. "Blockchain" software is the technological foundation of "cryptocurrencies," which are named as such because of a blockchain's heavy usage of "cryptographic functions."[2] Basically, blockchain software consists of a lot of computer code used to store data, somewhat like a traditional database, yet substantially different in the way it functions.

24. Bitcoin, the first ever cryptocurrency, was released as open-source software in 2009 by an anonymous person, or group of persons, under the pseudonym "Satoshi Nakamoto."  Since 2009, several other cryptocurrencies have been invented by private persons seeking to improve upon, or offer alternatives to, Bitcoin software.  Some of the most popular cryptos available for "mining" or purchase today include Litecoin, Ethereum, and Ripple.[3]

25. In 2011, a computer scientist named Charlie Lee created Litecoin as another open source software project.  In technical details, Bitcoin and Litecoin software are largely the same: people can create and transfer "coins" to each other based on an open source, cryptographic protocol.  All transactions are recorded and stored on the "blockchain" that corresponds to the given "coin."  Someone else invented Ripple in 2012.  Someone else invented Ethereum in 2013. Ripple and Ethereum are less similar to Bitcoin in their technical functions than is Litecoin.  Ripple and Ethereum are also different from each other in their technical functions.

---

[2] A "cryptographic function" can be described as a mathematical algorithm which maps data of arbitrary size to a bit string (hence, the name "*bit*coin") of a fixed size, called a "hash value" or "hash."  Cryptographic functions are designed to be one-way mathematical functions: that is, a function which is practically impossible to solve in reverse.  Generally speaking, the only way to recreate the *input* data from a proper cryptographic function's *output* data (the "hash") is to try *all possible inputs* to see if they produce a matching output.  The input data of a cryptographic function is often called the "message," and the output hash value is often called the "message digest" or "digest."

[3] Bitcoins and other cryptos are "mined" through the use of private computers to solve complex math problems.  Upon solving a given math problem, the "miner" is awarded units of Bitcoin or whatever other crypto is being "mined."

26.     Nobody has a monopoly, control or oversight on the invention of cryptocurrencies. Additionally, once a new crypto-blockchain project is invented and publicly distributed, it may well change into something else later.  This is because the blockchain upon which a given virtual currency operates is maintained through a consensus of private computers running the given blockchain's software; these private computers are called "mining nodes."

27.     There is no central authority to validate transactions or ownership.  In fact, the widely known "Bitcoin" cryptocurrency of today is not the same "Bitcoin" that existed as recently as 2017.  They are two distinct virtual currencies operating on two distinct blockchains, with two different records of transactions and ownership.  Likewise, the "Ethereum" cryptocurrency of today is not the same "Ethereum" cryptocurrency of 2015; they are today two distinct virtual currencies, operating on two distinct blockchains with two different records of transactions and ownership.  In both cases, a "forking" of the blockchain and corresponding cryptocurrency occurred because of significant changes to the blockchain's software that not all users (or "mining nodes") agreed upon.  Consequently, in each case, there are now two distinct cryptocurrencies instead of one.

28.     All that to say: private computer programmers create cryptos, and private computer programmers can and do change the nature, function and ownership of cryptos on the fly.  And such "forking" is not considered scandalous or unlawful.

29.     Cryptos can also have use cases beyond serving as digital units of "currency." Ethereum, for example, is a blockchain software platform focused on providing "smart contracts." Smart contracts are computer programs that are stored on the Ethereum blockchain, and can be accessed by Ethereum users.  Smart contracts are capable of, *inter alia*, managing agreements between users, storing information about a particular application (such as domain registration

information or membership records), and interacting with other "smart contracts" (*i.e.,* computer programs).

30.     Ultimately, despite cryptos' lack of government endorsement, economic status, centralized oversight, acceptability as payment, or even cognitive accessibility in the minds of laypersons, cryptocurrencies have gained broad-based public attention for their potential *applications* in the future of business and finance.  Many consumers have come to view cryptos and blockchain software as the future of money, or the future of financial technology.  Even major banks like Chase see valuable, potential applications for this technology in future monetary transactions and economic transactions. *See, e.g.,* https://www.ccn.com/big-banks-are-investing-heavily-in-blockchain-and-crypto-364-billion-investment-firm/ (last visited August 15, 2018).

31.     As of today, though, cryptos are not money, nor do they represent claims on or derivatives of money.  Whatever their "coin"-sounding names might portend, virtual currencies and their blockchain systems are fundamentally private-sector technologies, computer codes, and software applications.  Accordingly, the U.S. Internal Revenue Service deems cryptos to be personal "property" (not "currency," or money) for federal tax purposes.  With court approval, the U.S. Commodity Futures Trading Commission regulates the purchase and sale of cryptos as transactions in "commodities."  *See, e.g., C.F.T.C. v. McDonnell*, 287 F.Supp.3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies are '*goods'* exchanged in a market for a uniform quality and value.") (emphasis added).  Certain types of cryptos, none of which were sold by Coinbase during the relevant period, can also be deemed "securities" by the U.S. Securities and Exchange Commission.  *See, e.g.,* https://www.cnbc.com/2018/06/14/bitcoin-and-ethereum-are-not-securities-but-some-cryptocurrencies-may-be-sec-official-says.html (last visited August 15, 2018).

**Crypto Sellers As Credit Card Merchants**

32.     In recent years, as virtual currencies began to spread from a small segment of computer science gurus, into the media, and ultimately into the public consciousness, tech-savvy entrepreneurs began to develop new infrastructures to support the buying and selling of cryptos to consumers.   Among such "infrastructure" businesses was a now-prominent website called "Coinbase" (www.coinbase.com).  Coinbase serves as one of the largest cryptocurrency dealers in the United States.  Coinbase.com is owned and operated by San Francisco-based Coinbase, Inc., a privately held company that buys and sells cryptocurrencies to consumers through a user-friendly web interface.

33.     For those consumers who think it prudent to acquire a virtual currency for investment or other purposes, but who lack the computing power to "mine" (or invent) cryptos themselves, Coinbase is one of the easiest and most cost-effective options for acquiring a crypto. Upon creating an online account with Coinbase, a user may login to their account, select a type and quantity of virtual currency to buy, enter their payment information, click "Buy," and become the owner of a virtual currency.  Coinbase itself buys cryptos from, and sells cryptos to, its customers, rather than facilitating transactions between customers.[4]

34.     In mid-2016, Coinbase began accepting credit card payments from its customers for cryptos.  Some smaller crypto merchants did likewise at various times.  Many consumers took advantage of the opportunity to buy cryptos with their credit cards, not because they needed to borrow money to make the purchase, but because using a credit card was the most convenient way to acquire cryptos instantly via Coinbase and other merchants.  Buying virtual currencies with a

---

[4] Coinbase is sometimes referred to as a cryptocurrency "exchange," but Coinbase is not an exchange in the mold of stock exchanges or other securities and commodities exchanges.

bank account number would require days of processing time, so many consumers used credit cards to buy cryptos from Coinbase and other merchants to avoid delays in delivery, or for other reasons. Nowadays, consumers use their credit cards to buy many different goods and services for many different reasons other than a need to borrow money.  General convenience is one of the most common reasons, particularly when it comes to making online purchases.  Many consumers also value their credit card rewards' programs, which are typically not available for debit cards.

## Chase's Written Contracts and Disclosures to Its Credit Cardholders

35.     Chase is one of the largest national banks and credit card issuers in the United States.  Chase issues a number of different credit cards to consumers nationwide, such as the Chase Freedom, Chase Sapphire, and Chase Slate credit cards, which differ primarily according to their "introductory offers" and "rewards" features.  These include account-opening bonus offers, as well as other forms of compensation that vary according to a card member's spending levels.  Chase also offers a series of "Chase Partner Cards," which are Chase-issued credit cards that offer vendor-specific rewards to a cardholder in proportion to his or her spending levels.  For example, the Chase Marriott Rewards card allows its members to earn discounts on Marriott hotel stays, while Chase's Southwest Airlines credit card allows its members to accrue flight discounts over time.

36.     As far as is relevant to this case, all Chase-issued, consumer credit cards come with substantially identical Written Contracts. *E.g.,* Ex. A.  At all relevant times, each Written Contract has set forth the applicable interest rates and fees (if any) that apply to different types of credit card transactions.  Each Written Contract provides for some variable annual percentage rate ("APR") for "Purchases," and a substantially higher APR for "Cash Advances."

37. At all relevant times, with respect to "Purchases," all of Chase's Written Contracts have stated: "You [the cardholder] may use your account to buy goods and services.  We [Chase] authorize charges to your account in accordance with the terms of this agreement."  *Id.*

38. With respect to "Cash Advances," every Written Contract has stated:

> You may obtain cash from automatic teller machines, at banks or by using cash advance checks [issued by Chase].  Unless we [Chase] say otherwise, balance transfer checks or promotional checks made payable to cash or yourself will be treated as cash advances.  We treat certain other transactions as cash advances.  See the Cash-like Transactions section under [the] Important Definitions [section] above.

39. The "Important Definitions" section goes on to enumerate the other types of transactions that constitute "Cash-like Transactions," and thus "Cash Advances," under the Written Contracts:

> The following transactions will be treated as cash advances: *purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions;* purchasing lottery tickets, casino gaming chips, race track wagers or similar betting transactions; and making a payment using a third party service.[5]

40. The Written Contracts do not enumerate any other type of credit card transaction as a "cash-like transaction" subject to "Cash Advance" fees and interest charges.

**One of These Things is Not Like the Others**

41. "Foreign currency" is a type of actual "currency," a form of actual money.  *See* ¶¶17-19, *supra.*

42. The term "wire transfer" denotes a transfer of actual money, whether foreign or domestic, between deposit accounts at depository institutions.  The deposits themselves constitute money.  *See* ¶17, *supra.*

---

[5] All emphasis is added herein unless otherwise stated.

43.    "Travelers checks" are financial instruments issued by financial institutions. Travelers checks have a face monetary value based on the amount of money paid to the issuer, by the consumer, to issue the checks.  Travelers checks represent claims on actual money, because someone paid — with money — for that money which the travelers checks represent.  Travelers checks are generally accepted as financial instruments because they can be exchanged at banks for their face monetary value.

44.    Likewise, money orders are issued financial instruments that represent claims on money.  "Similar" to travelers checks, money orders have a fixed monetary value which is based on the amount of money paid to the issuer, by the consumer, to issue the money order.  Money orders are used for transferring money from one person (or entity) to another by way of the third-party issuer.  Money orders are generally accepted as financial instruments and as payment due to the backing of an issuer, who has been paid money to issue and honor the money order.  The consumer buys from the issuer the issuer's promise to pay to a given payee a particular dollar amount (or amount of some other currency).

45.    "Cryptocurrencies" or "virtual currencies" do not have a face value or fixed monetary value that derives from the amount of money paid for them.  Cryptos do not represent a legally or financially valid claim on money.  Cryptos are worth only the amount of money that one is able to sell them for, whether to a friend or on an open market.  Cryptos are not generally accepted financial instruments at all.  They are neither issued nor created by governments or by regulated financial institutions.  They are computer codes invented, and frequently changed, by private computer programmers.  ¶¶20-31, *supra*; *see also* Time.com/money/5087142/ripple-chris-larsen-cryptocurrency/, "This Cryptocurrency Inventor Has Suddenly Become One of the World's Richest Men," published Jan. 4, 2018 (last visited August 10, 2018) ("Cryptocurrency has a new

king.  His name is Chris Larsen, and he's the co-founder and former CEO of Ripple, which created the digital token known as XRP.  He's now one of the world's richest billionaires . . . .").  That is not how money works.  "Money," "cash," and "cash-like" instruments do not have "inventors" that create wealth for themselves by way of unregulated, overnight innovation and sales.  This is instead how a new technology works its way into an economy.

46.     In sum, as a factual matter, cryptos are neither "cash-like" nor "similar" to "travelers checks, foreign currency, money orders, [or] wire transfers."

**Chase's Waffling Course of Dealing With Plaintiffs and the Class**

47.     On and before January 22, 2018, Plaintiff Tucker made several purchases of cryptos from Coinbase using his Chase credit card.  On and before January 22, 2018, Chase affirmatively designated, disclosed, and charged Mr. Tucker's crypto purchases as "Purchase" transactions under his Written Contract.  Specifically, pursuant to 15 U.S.C. § 1637(b) and 12 C.F.R. § 1026.7, Chase sent him monthly account statements, including but not limited to monthly account statements dated January 20, 2018 and February 20, 2018.  The account statement dated January 20, 2018 disclosed that *all* of Mr. Tucker's crypto purchases were "Purchase" transactions under his cardholder agreement.

48.     On and after January 23, 2018, Plaintiff Tucker bought additional cryptos from Coinbase using the same Chase credit card, reasonably understanding them to constitute Purchase transactions.  At no point did Chase amend its Written Contract with Mr. Tucker, or otherwise disclose any change to the terms of Mr. Tucker's Written Contract, or to the actual credit terms on his account.  Nevertheless, on and after January 23, 2018, Chase affirmatively designated and charged Plaintiff Tucker's crypto purchases as "Cash Advance" transactions under his Written Contract.  Chase assessed substantial, never-disclosed Cash Advance fees and interest charges

against Plaintiff Tucker for these transactions.  Plaintiff Tucker called Chase's customer service line to contest the wrongful and unexpected charges on his account, yet Chase refused to remove them.  Plaintiff Tucker was forced to pay and did pay these wrongful charges.

49.     At no point did Chase attempt to notify Mr. Tucker — neither before nor immediately after he executed his post-January 22 crypto purchases — that such purchases would be deemed "Cash Advance" transactions rather than "Purchase" transactions under his Written Contract.  Had Mr. Tucker known that Chase was going to treat his virtual currency Purchases as Cash Advances, Mr. Tucker would not have used his Chase credit card to buy virtual currencies on or after January 23, 2018, and would not have incurred or been forced to pay the Cash Advance fees and interest charges that Chase levied against him.

50.     On and before January 22, 2018, Plaintiff Hilton also made several purchases of cryptos from Coinbase using his Chase credit card.  On and before January 22, 2018, Chase affirmatively designated, disclosed, and charged Mr. Hilton's crypto purchases as "Purchase" transactions under his Written Contract.  Specifically, pursuant to 15 U.S.C. § 1637(b) and 12 C.F.R. § 1026.7, Chase sent him monthly account statements, including but not limited to monthly account statements dated January 4, 2018 and February 4, 2018.  The account statement dated January 4, 2018 disclosed that *all* of Mr. Hilton's crypto purchases (beginning December 12, 2017) were "Purchase" transactions under his cardholder agreement.

51.     After January 23, 2018, Plaintiff Hilton made an additional crypto purchase from Coinbase using the same Chase credit card, reasonably believing this to be a Purchase transaction.  At no point did Chase amend its Written Contract with Mr. Hilton, or otherwise disclose any change to the terms of Mr. Hilton's Written Contract or to the actual credit terms on his account.  Nonetheless, after January 23, 2018, Chase affirmatively designated and charged Plaintiff Hilton's

15

latest crypto purchase as a "Cash Advance" transaction under his Written Contract.  Chase assessed substantial Cash Advance fees and interest charges against Plaintiff Hilton.

52.     At no point did Chase attempt to notify Plaintiff Hilton — neither before nor immediately after he executed his post-January 22 crypto purchase — that such purchases would be deemed "Cash Advance" transactions rather than "Purchase" transactions for the first time under his Written Contract.  Had Mr. Hilton known that Chase was going to treat his routine Purchases as Cash Advances, Mr. Hilton would not have used his Chase credit card to buy cryptos after January 22, 2018, and would not have incurred or been forced to pay the Cash Advance fees and interest charges that Chase levied against him.

53.     Before January 22, 2018, Plaintiff Smith made several purchases of cryptos from Coinbase using his Chase credit card.  Before January 22, 2018, Chase designated, disclosed, and charged Mr. Smith's crypto purchases as "Purchases" under his Written Contract with Chase.  Specifically, pursuant to 15 U.S.C. § 1637(b) and 12 C.F.R. § 1026.7, Chase sent him monthly account statements, including but not limited to monthly account statements dated December 18, 2017, January 18, 2018, and February 18, 2018.  The account statements dated December 18, 2017 and January 18, 2018 disclosed that *all* of Mr. Smith's crypto purchases were "Purchases" under his cardholder agreement.

54.     On and after January 23, 2018, Plaintiff Smith made additional crypto purchases from Coinbase using the same Chase credit card, reasonably believing them to be Purchase transactions.  At no point did Chase amend its Written Contract with Mr. Smith, or otherwise disclose any change to the terms of Mr. Smith's Written Contract or to the actual credit terms on his account.  Nevertheless, on and after January 23, 2018, Chase affirmatively designated and charged Plaintiff Smith's crypto purchases as "Cash Advance" transactions under his Written

Contract.  Chase assessed substantial Cash Advance fees and interest charges against Plaintiff Smith.  Mr. Smith called Chase's customer service line to contest these wrongful and unexpected charges on his account.  Chase conceded and refunded the Cash Advance fees, but refused to remove or reimburse him for the Cash Advance interest charges.  Plaintiff Smith was forced to pay and did pay the wrongful Cash Advance interest charges.

55.    At no point did Chase attempt to notify Mr. Smith — neither before nor immediately after he executed his post-January 22 crypto purchases — that such purchases would be deemed "Cash Advance" transactions rather than "Purchase" transactions under his Written Contract.  Had Mr. Smith known that Chase was going to treat his virtual currency Purchases as Cash Advances, Mr. Smith would not have used his Chase credit card to buy virtual currencies on or after January 23, 2018, and would not have incurred or been forced to pay the Cash Advance fees and interest charges that Chase levied against him.

56.    It was Chase's affirmative decision and action, not any merchant's affirmative decision or action, to wrongfully assess Cash Advance fees and interest charges against Plaintiffs and the Class without notice.

57.    From its own database records, Chase knew as of January 2018 that many of its customers, like Plaintiffs, had been using their Chase credit cards to buy cryptos from Coinbase and other credit card merchants.  Chase further knew that it had long designated, disclosed and charged such transactions to cardholders as Purchases under their Written Contracts.  Yet Chase affirmatively declined to notify Plaintiffs and other cardholders of this important change, and declined to reimburse them because, frankly, Chase's management doesn't think much of them.

58.    Jamie Dimon, the Chief Executive Officer of Chase's parent company, JPMorgan Chase & Co., repeatedly and publicly commented on consumer demand for virtual currencies.

17

Specifically, in September 2017, Mr. Dimon publicly announced his belief that Bitcoin was "a fraud": one that is "worse than tulip bulbs."  As for any employee he found trading Bitcoins, he added, "I'd fire them in a second.  For two reasons: It's against our rules, and they're stupid."[6]  In addition to firing its "stupid" employees, Chase consciously chose to start *fining* its "stupid" cardholders for these transactions, without notice.  Despite knowing that these new charges would blindside thousands of its cardholders, like Plaintiffs, Chase made no effort to disclose to cardholders that they would incur Cash Advance charges on their crypto purchases.

59.     Not only did Chase fail to disclose these new finance charges directly to its cardholders, as it should have, Chase additionally passed on the opportunity to *publicly* disclose these new charges, even after they were implemented by the bank.  On January 25, 2018, at least days after Chase consciously effected this change, CNBC published an article titled "Bank of America, Citigroup reviewing the use of credit cards to buy bitcoin."  *See* https://www.cnbc.com/2018/01/25/bank-of-america-citigroup-reviewing-the-use-of-credit-cards-to-buy-bitcoin.html.  The CNBC article stated that *"J.P. Morgan Chase is still allowing customers to buy cryptocurrencies with their Chase credit cards, the bank told CNBC.  The bank did not respond to a question about potential changes to that policy."  Id.*  There was no comment from Chase on its *actual, recent* changes to these transactions: instead, only a statement that cardholders could "still" proceed as normal with these transactions.  Chase well knew by January 25 that this statement was misleading because Chase knew by January 25 that this Cash Advance change had been implemented.  Chase did not make any good-faith attempt to disclose it to consumers, even *after* Chase implemented this change.

---

[6] *See, e.g.,* https://www.bloomberg.com/news/articles/2017-09-12/jpmorgan-s-ceo-says-he-d-fire-traders-who-bet-on-fraud-bitcoin ("Jamie Dimon Slams Bitcoin as a 'Fraud'").

60.     Over the ensuing months, many Class members complained formally and informally about their undisclosed Cash Advance fees and interest charges.  When Plaintiffs and other cardholders have done so, Chase has responded by deceptively placing the blame on Coinbase, and by making additional false and misleading statements to cardholders and the public.

**Chase's Affirmative "Defense" to Class Members' Complaints Are False and Misleading**

61.     In early 2018, upon receiving many formal and informal complaints from aggrieved cardholders, Chase quickly made up some false and misleading talking points, to publicly deflect blame for its own acts and omissions.  Chase has incessantly regurgitated the same misleading, public relations talking points ("PR Talking Points") to its customers and the public throughout 2018.  Chase's PR Talking Points are not merely inadequate as a legal defense to this case; they are also factually false and misleading.

### *PR Talking Point No. 1: Chase's Deceptive Blame Game*

62.     After receiving a written complaint from one of its aggrieved cardholders earlier this year (not one of the Plaintiffs named herein), Chase responded with a letter to the aggrieved cardholder stating, "**We are not able to assist you further with your dispute**." (emphasis in original).  Chase's letter dated July 5, 2018, well into the pendency of this case, further stated:

> We are responding about your two . . . charges from Coinbase on February 1, 2018, and February 2, 2018.  *After researching we found that the merchant billed the charges to your account correctly.  These charges are cash-like transactions, which are considered cash advances under the terms of your Cardmember Agreement*.  For your review we have enclosed a copy of your Cardmember Agreement, which provides the fees and finance charges for this type of transaction.  *Merchants were processing these transactions as purchases using incorrect merchant category codes and the merchants corrected the issue.  Your account was credited and debited to fix the incorrect coding*.  We have enclosed your February and March 2018 statement for review.

The above statements to one of Chase's aggrieved cardholders, on July 5, parroted the factual "defense" that Chase has raised in this action.  *See, e.g.,* Dkt.  17 (filed June 6, 2018) at 3 ("The

only reason that, for a time, [Plaintiff] enjoyed more favorable terms is that cryptocurrency transactions with Coinbase were being processed by its third-party transaction processor as ordinary purchases; in January 2018, the processor changed the transaction coding and began to treat them as quasi-cash transactions.").

63.     Chase's PR Talking Points quoted above were and are materially false and misleading.  The true facts are that merchants are incapable of processing their customers' credit card transactions as "purchases," or "cash advances," or "balance transfers," or whatever else. Only the card issuer is capable of setting the actual credit terms for particular types of credit card transactions.   *See*   https://www.investopedia.com/news/credit-card-firms-charging-higher-fees-crypto-purchases (last visited June 7, 2018) ("A Visa spokeswoman said via voicemail, '*it would be up to the individual issuer, the financial institution that issued the card, to determine any fees that they might charge for certain types of purchases*, so it's not Visa.  We don't issue cards.'"). Chase, and Chase alone, determined and imposed these fees and interest charges against Plaintiffs as a factual matter; no other person or entity forced Chase to decide on or impose these charges.

64.     Furthermore, merchants like Coinbase did not "correct the issue" with respect to their Merchant Category Codes ("MCCs"), but rather, as detailed herein, Coinbase and other "merchants" were affirmatively required by Visa, at Chase's request, to change their MCC coding *to a MCC that clearly did not apply to cryptocurrency sellers like Coinbase*.  This MCC change was unfairly and unilaterally imposed upon Coinbase and other merchants on January 23, 2018, for the particular purpose of helping Chase wrongfully treat these credit card transactions as Cash Advance transactions under its Written Contracts.

### *The Truth About PR Talking Point No. 1: Coinbase and Others Were Forced to Assume the Wrong MCC on January 23, 2018 to Serve Chase's "Cash Advance" Purposes*

65.     The technical mechanism by which Chase — not "merchants" — effected this change on January 23, 2018 was by requiring Coinbase and other "merchants" to change their MCCs on the Visa credit card network.  During the relevant time period, Chase issued credit cards operating on the Visa network only, not the MasterCard network.  Based on Visa's existing data standards for assigning MCCs to credit card merchants, *the MCC to which Coinbase was forcibly reassigned was clearly not the "correct" MCC for Coinbase*.

66.     Specifically, the Visa Data Standards Manual ("DSM") in effect at the time listed several hundred MCCs, each with different descriptions for the different types of businesses that should be assigned to each MCC.  The DSM in effect at the relevant time also provided helpful interpretive guidance for assigning MCCs to merchants, based on the various MCC descriptions contained in the DSM.

67.     Under a section titled "General Rules," the DSM explained:

> The MCC is a four-digit number assigned to describe a merchant's primary business based on annual sales volume measured in local currency. In addition, some MCCs identify a specific merchant or type of transaction. Because Visa and its members [*i.e.,* issuers] use MCC data for a range of purposes, including activity tracking, reporting, and risk management purposes, *it is crucial that acquirers assign the proper MCC to each merchant.*

The DSM further instructed as follows under a subsection titled "Basic Rules to Remember":

> The following rules should be considered when assigning MCCs:
>
> 1.  *Select the MCC that most accurately describes the merchant's business.* The MCC, in most cases, should reflect the primary type of business in which the merchant is engaged.  If the merchant has more than one line of business and may qualify for more than one MCC, the merchant must either:
>
>     Use the MCC that describes the business with the highest sales volume (measured in local currency) to process all Visa sales [or]
>
>     Use different MCCs for each line of business.

2. Use MCCs termed "miscellaneous" only if there is no MCC specific to the merchant's business. *MCC descriptions are very accurate*, and merchants must only be assigned a "miscellaneous" MCC when no other MCC applies to its business. Miscellaneous MCCs generally end in the number 99. Examples are MCC 5499 — Miscellaneous Food Stores and MCC 5999 — Miscellaneous and Specialty Retail Shops. MCCs are used for a variety of purposes by acquirers [*i.e.,* merchants' banks], issuers, and Visa. *It is important that a merchant be assigned the MCC that most accurately describes its business*. When there is such an MCC, the merchant must not be assigned a "miscellaneous MCC."

68.      The DSM further provided that acquirers (*i.e.,* merchants' banks) must "have a clear understanding of different merchants' business types and their proper MCC designation," and that "[a]ll acquirers are responsible for making sure that each merchant business is identified using *the most appropriate MCC*." The DSM also said that, "Visa retains the right to require *corrections* [not 'arbitrary changes'] to non-compliant or confusing merchant descriptors."

69.      As of January 23, 2018, Coinbase and its financial institution were arbitrarily and capriciously required by Visa, at Chase's request, to change Coinbase's longstanding, pre-approved MCC to a different MCC: numbered 6051.

70.      As of January 23, 2018, MCC 6051 was titled in the Visa DSM as "*Non-Financial Institutions—Foreign Currency, Money Orders (Not Wire Transfer), and Travelers Cheques*." The DSM's complete description for MCC 6051 stated as follows:

This MCC must be used for *the funding of an account, the purchase of foreign currency, money orders, or travelers cheques* occurring at non-financial institutions such as currency exchanges, money order merchants, and hotels. The face-to-face purchase of *foreign currency, money orders, and travelers cheques* at financial institutions such as banks, savings and loans, thrifts and credit unions must be classified under MCC 6012 – *Financial Institutions — Merchandise and Services*. (emphasis in the last two lines from the original).

Unlike in Chase's Written Contracts with cardholders, *there was no provision in the DSM describing MCC 6051 as representing "similar cash-like transactions"* (or "cash-like transactions" generally, or any other types of transactions). The code description for MCC 6051

had always been expressly limited to "the funding of an account, the purchase of foreign currency, money orders or travelers cheques."

71.     As the DSM itself explained, "MCC descriptions are very accurate," not generalized, except for those "miscellaneous" codes which are to be used sparingly.  *See* ¶67, *supra*.  For the reasons explained in ¶¶17-31 and ¶¶41-46, *supra*, the sale of virtual currencies did not, in fact, come close to matching Visa's "very accurate" description for MCC 6051 as of January 23, 2018.

72.     In addition, as of January 23, 2018, there were several other more accurate MCCs in the DSM that could have been chosen for Coinbase.  Yet Visa acted against its own DSM, at Chase's request, and required Coinbase to switch to an MCC *that clearly never applied to Coinbase*, because:

(a)  the particular purpose of this bogus MCC change was to aid and abet Chase in charging wrongful Cash Advance fees and interest charges against cardholders; and

(b)  Chase's computer systems were long programmed to designate, disclose and charge transactions coded with MCC 6051 as "Cash Advance" transactions under the Written Contracts.[7]

73.     Visa itself previously approved a different MCC for Coinbase, other than 6051, as Visa merchants cannot be assigned an MCC in the first place without Visa's approval.

---

[7] This particular programming aspect of Chase's computer systems was not a problem *before* January 23, because the "Cash Advance" and "Cash-Like Transactions" language in Chase's Written Contracts with cardholders fairly matched the DSM's description of MCC 6051 before January 23.  But on and after January 23, Chase's computers were now programmed to charge as "Cash Advances," a brand new "category" of transactions that were never disclosed in, or permitted by, the terms of the Written Contracts.  This is the technical mechanism by which Chase quietly effected these new charges against cardholders.

74.     Moreover, in March 2018, just after Visa began requiring Coinbase and other crypto sellers to switch to the inapposite MCC 6051, Visa's Chief Financial Officer publicly declared, "My personal view is that cryptocurrencies are more speculative *investment commodities* than payment options, operating in a very unsettled regulatory environment." He further commented on one of the many fundamental differences between cryptocurrencies and money: "With a currency issued by the Federal Reserve, I know who stands behind it."   With cryptocurrency, he said: "Who's good for the money?   *Who the hell knows?*"   In addition, he opined, *"This is the ultimate thing that you hear about when you have a bubble, when the guy shining your shoes tells you what stock to buy." See* https://www.ft.com/content/ba6c2c40-285f-11e8-b27e-cc62a39d57a0 (last visited August 15, 2018).

75.     Visa's CFO was likely correct to call cryptocurrencies "investment commodities" in March 2018.  And conveniently, *Visa's DSM had a specific MCC for investment commodities at the time: MCC 6211*.  The DSM stated that, "Merchants classified under this MCC [6211] buy, sell and broker securities, stocks, bonds, *commodities*, and mutual funds."  This MCC 6211 could well have been used to "accurately" and "appropriately" describe Coinbase, because Coinbase sells cryptocurrencies to consumers for investment and other purposes.  Coinbase never sold "foreign currency, money orders, or travelers cheques," as required by MCC 6051.  But neither Visa nor Chase demanded the admittedly more "accurate" and "appropriate" MCC 6211 from Coinbase or from Coinbase's financial institution: because the goal of this MCC change was never "accuracy," as required by the DSM, but rather, to help Chase levy Cash Advance charges against its "stupid," "shoe-shining" cardholders.

76.     As of January 2018, Visa's DSM also had existing MCCs for *"Digital Goods — Applications (Excludes Games)"* and *"Digital Goods — Large Digital Goods Merchant."*  These

were listed as MCC 5817 and MCC 5818, respectively.  The DSM described the former as selling *"applications (excludes games: see 5914) that are delivered in electronic format.  Software, if delivered in electronic format, may also be classified under this category."*  The DSM described the latter as *"large merchants that sell digital goods (i.e., goods delivered via electronic format) with a minimum threshold of 25 million transactions annually."*  Coinbase, the preeminent seller of virtual currencies, more accurately and appropriately fell into either of these MCCs than into MCC 6051 because MCC 6051 was — by its express terms — limited to sellers of "foreign currency, money orders, or travelers cheques."

77.     But again, "accuracy" was neither Chase's nor Visa's goal in reassigning Coinbase and other crypto merchants to MCC 6051.  The sole purpose was to impose new Cash Advance charges against credit cardholders like Plaintiffs and the Class.  To serve that purpose, far more "accurate" and "appropriate" MCCs were ignored by Chase and Visa in favor of the clearly erroneous MCC 6051, which would accomplish the bank's particular purpose.

78.     In April 2018, long after this MCC reassignment was foisted upon Coinbase, Visa substantially amended (as opposed to "corrected") its own DSM to reflect the new actions it had taken.  As of April 26, 2018, Visa amended the DSM to provide a brand new version of MCC 6051, which is now titled: *"Non-Financial Institutions — Foreign Currency, Non-Fiat Currency (for example: Cryptocurrency), Money Orders (Not Money Transfer) Travelers Cheques, and Debt Repayment."*  The substantially amended, post-lawsuit description for MCC 6051 now provides:

> This MCC must be used for the funding of an account, the purchase of foreign currency, *non-fiat currency (for example: cryptocurrency)*, money orders, or travelers cheques that occurs at non-financial institutions such as currency exchanges, money order (a negotiable paper-based remittance — not a Money Transfer) merchants, and hotels.

> This MCC must also be used for the repayment of a loan or debt if the entity that holds the debt is not a financial institution.

*A merchant that sells non-fiat currency such as cryptocurrency must use MCC 6051 for those transactions.*  All other transactions at the same merchant locations must use the appropriate MCC for those transactions.

79.     The main point of these MCC allegations (¶¶61-78, *supra*) is this: Chase's affirmative "defense" in this case is merely a deceptive PR Talking Point calculated to deflect blame upon third-party actors who do not and cannot control Chase's dealings with its cardholders. The true facts are and always have been that:

(a) Merchants and their banks were never "billing" these transactions to Chase as "purchases" or "cash advances," because they were never capable of doing so.  Chase has always had complete control over its own billing systems, including but not limited to whether Chase bills different MCCs as Purchases or Cash Advances.

(b) Chase's switch from "Purchases" to "Cash Advances" was not merely the result of some technical error on the part of Coinbase or its financial institution.  Chase and its business partners at Visa *literally rewrote the book on credit card transaction processing in order to implement their desired change in credit terms against Plaintiffs and the Class.*

These are the true facts concerning Chase's affirmative "defense."

### Deceptive PR Talking Point No. 2:  These Are "Risky" Transactions

80.     Almost immediately after January 23, 2018, all remotely involved entities (Chase, Visa, and Coinbase, among others), were faced with widespread customer outrage as well as national media inquiries regarding these charges.  In response, Chase decided to take a more direct approach to the "problem" of its cardholders buying cryptos.  Effective February 2, 2018, only ten days post-January 23, Chase began declining all attempted crypto transactions on its credit cards.

26

In a statement to CNBC the same day, a Chase spokesperson said, "At this time, we are not processing cryptocurrency purchases using credit cards, *due to the volatility and risk involved*."

81.     This PR Talking Point is equally disingenuous and misleading.  In fact, on February 6, 2018 — just four days after deciding to decline all crypto purchases — Chase began allowing customers to use their credit cards *to gamble on horse-racing*.  *See* https://www.ntra.com/chase-bank-begins-accepting-credit-card-transactions-between-customers-and-u-s-licensed-adws   (last visited August 15, 2018).  And at all relevant times, Chase continually permitted customers to buy lottery tickets and casino gaming chips with their credit cards: without limits, except for any standing credit limits on the accounts.

82.     Chase's decisions, acts and omissions regarding crypto-buying never had anything to do with Chase's views of existing contracts or credit "risk."  Chase's kneejerk decisions, acts and omissions in this case were about taxing "shoe-shining" consumers for "stupid" behavior. This was a conscious act, not a passive act.

83.     But in any event, it was an unlawful act.

## COUNT I
## Breach of Contract

84.     Plaintiffs hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

85.     Plaintiffs and each member of the Class entered into adhesive, Written Contracts with Defendant Chase Bank USA, N.A.

86.     The Written Contracts provide that, "This agreement and your account will be governed by federal law, as well as the law of Delaware, and will apply no matter where you live or use this account."  *See, e.g.,* Ex. A.

27

87.     Under Delaware law, Defendant, and its agents acting on its behalf, breached the Written Contracts between Chase and members of the Class by charging Cash Advance fees and interest charges on credit card transactions, which did not and do not constitute "Cash Advances" or "Cash-Like Transactions" under the Written Contracts.

88.     Defendant additionally, independently, and admittedly breached the term of its Written Contracts that provides "**Purchases** [WHAT IT MEANS TO YOU] You may use your account to buy goods and services.  [OUR RESPONSIBILITY] We authorize charges to your account in accordance with the terms of this agreement."  *See* Ex. A at 5.  According to Chase itself, Chase did not and does not authorize charges to cardholders' accounts "in accordance with the terms of this agreement," but rather, in accordance with *some third party's or parties' interpretation(s) of Visa's Data Standards Manual*.  Chase's own computer systems "authorize transactions" in accordance with MCCs, and MCCs themselves *are not "based on"* the terms of cardholder agreements.  MCCs are instead "based on" the terms of the DSM, and someone else's interpretation of the DSM.  The terms of the DSM (specifically, MCC descriptions) could well be amended to be "based on" the terms of cardholder agreements.  But they are not.  Thus, Chase does not authorize charges "based on" the terms of its cardholder agreements: but rather, based on something else entirely.

89.     As a direct and proximate result of Defendant's breaches of its Written Contracts with Class members, and the implied covenant of good faith and fair dealing, Plaintiffs and each member of the Class have sustained financial losses, costs, damages and expenses in amounts to be proven at the trial of this matter.

## COUNT II

**Violations of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, Regulation Z,
12 C.F.R. §§ 1026.1, *et seq.* – "Clear and Conspicuous" Requirement**

90.     TILA expressly provides that, "Information required by this subchapter shall be disclosed clearly and conspicuously, in accordance with Regulations of the Bureau." 15 U.S.C. § 1632(a).  Regulation Z, in turn, provides that, "The creditor shall make the disclosures required by this subpart clearly and conspicuously." 12 C.F.R. § 1026.5(a)(1)(i).

91.     Interpreting TILA, the Bureau provides in Subpart B of Regulation Z that Defendant must make certain "Account-opening Disclosures" in a "clear and conspicuous" manner, including but not limited to "*The type of transaction* to which [an interest] rate applies, if different rates apply to different types of transactions." 12 C.F.R. § 1026.6(b)(4)(i)(C).

92.     A credit card disclosure required by TILA and Regulation Z is not "clear and conspicuous" within the meaning of TILA and Regulation Z if such disclosure is ambiguous from the perspective of a reasonable consumer.  *See, e.g., Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010) ("[I]t is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *Watts v. Key Dodge Sales, Inc.*, 707 F.2d 815, 817 (5th Cir. 1983) ("At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley*, 772 F.2d 815, 817 (11th Cir. 1985) ("[T]hese divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation.").[8]

---

[8] Indeed, it is this requirement of TILA and Regulation Z that requires Chase to actually *define* the terms "Purchase" and "Cash Advance" in the first place; creditors may not simply say "the rate for Purchases is X, and the rate for Cash Advances is Y," and disclose nothing more, as such amorphous language would not "clearly and conspicuously" disclose to consumers the "types of transactions to which the [given] rate applies."

93.     By disclosing "Cash Advances" and "Cash-like Transactions" to include "purchasing travelers checks, foreign currency, money orders, wire transfers or *similar cash-like transactions*," Chase's account-opening disclosures were, in fact, unclear, ambiguous and affirmatively misleading as to the "types of transactions to which the [Cash Advance] rate applies," as such disclosure would leave the reasonable consumer unclear and misled as to which *other* types of transactions are sufficiently "similar" to the enumerated transactions (namely, "purchasing travelers checks, foreign currency, money orders, [or] wire transfers"), and sufficiently "cash-like," to be subject to Chase's "Cash Advance" charges.  As alleged herein, cryptocurrency purchases *are not objectively "cash-like" or "similar" when compared with the types of transactions enumerated as "cash-like" within the Written Contracts*.  Chase's required disclosures were ambiguous (at best) and misleading, not "clear and conspicuous" under TILA and Regulation Z, with respect to the "types of transactions to which the [Cash Advance] rate applies."

94.     In addition, Subpart B requires Defendant to make "Periodic statements" in a "clear and conspicuous" manner, and such periodic statements must clearly and conspicuously identify "each credit transaction in accordance with § 1026.8."  12 C.F.R. § 1026.7(b)(2).  In turn, § 1026.8 provides that each periodic statement by the creditor identify "Nonsale credit [transactions]" as follows: "For each credit transaction *not* involving the sale of property or services, the creditor must disclose a brief identification of the transaction . . . ."  12 C.F.R. § 1026.8(b).  The Bureau's official, authoritative interpretation of § 1026.8(b) states that the "creditor sufficiently identifies a nonsale transaction by describing the type of advance it represents, *such as a cash advance*, loan overdraft loan or any readily understandable trade name for the credit program."  Supplement I to § 1026.8(b).

95.     By sending Plaintiffs and the Class numerous periodic statements identifying their cryptocurrency transactions as both "Purchases" and "Cash Advances" — sometimes within the same periodic statement — Defendant compounded ambiguity upon ambiguity and thus failed to "clearly and conspicuously" identify the relevant credit card transactions in Plaintiffs' and the Class's periodic statements as required by TILA and Regulation Z.

96.     Had Chase provided Plaintiffs and the Class with "clear and conspicuous" disclosures as required by TILA and Regulation Z in either or both of their Written Contracts and periodic account statements, then Plaintiffs and other Class members would *not* have used their Chase credit cards to purchase virtual currencies and would not have incurred Chase's surprise "Cash Advance" fees or interest charges, effectively taking out personal cash loans from Chase without their knowledge or consent.  Plaintiffs and the Class acted reasonably at all relevant times; Chase did not.

97.     Pursuant to 15 U.S.C. § 1640(a), Plaintiffs and the Class bring this Count to recover their actual financial damages, plus statutory damages in the aggregate amount of $1 million, plus their costs of this action and reasonable attorneys' fees and expenses incurred therein.

## COUNT III
### Violation of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, Regulation Z, 12 C.F.R. §§ 1026.1, *et seq.* – "Significant Change in Account Terms"

98.     Plaintiffs hereby repeat and re-allege each and every allegation set forth above as if fully set forth herein.

99.     The Truth in Lending Act, at 15 U.S.C. § 1637(i)(2), requires credit card issuers to "provide a written notice of any significant change, as determined by rule of the [U.S. Consumer Financial Protection] Bureau, in the terms . . . of the cardholder agreement between the creditor and obligor, not later than 45 days prior to effective date of the change."

100.    Pursuant to its express authority under 15 U.S.C. § 1637(i)(2), the Consumer

Financial Protection Bureau ("Bureau") promulgated 12 C.F.R. § 1026.9(c)(2) which provides the

following "Rules affecting open-end (not home-secured) plans," *i.e.*, credit card plans:

> (i)    Changes where written advance notice is required.
>
>> (A) General.  For plans other than home equity plans . . . , when a
>> significant change in account terms as described in paragraph
>> (c)(2)(ii) of this section is made, a creditor must provide a written
>> notice of the change at least 45 days prior to the effective date of
>> the change to each consumer who may be affected.

12 C.F.R. § 1026.9(c)(2)(i) (emphasis added).  Section 1026.9(c)(2)(ii) then defines "Significant

changes in account terms" as follows:

> For purposes of this section, a "significant change in account terms"
> means a change to a term required to be disclosed under §
> 1026.6(b)(1) and (b)(2), an increase in the required minimum
> periodic payment, a change to a term required to be disclosed under
> § 1026.6(b)(4), or the acquisition of a security interest.

12 C.F.R. § 1026.9(c)(2)(ii).  The credit card account terms specifically enumerated in 12 C.F.R.

§ 1026.6(b)(1), (b)(2) and (b)(4) include, but are not limited to, the following:

> Transaction charges.  Any transaction charge imposed by the
> creditor for use of the open-end plan for purchases.

12 C.F.R. § 1026.6(b)(2)(iv).

> Cash advance fee.  Any fee imposed for an extension of credit in
> the form of cash or its equivalent.

12 C.F.R. §1026.6(b)(2)(vii).

> Type of transaction.  The type of transaction to which the [interest]
> rate applies, if different rates apply to different types of transaction.

12 C.F.R. § 1026.6(b)(4)(i)(C).

101.    By treating Plaintiffs' and the Class's crypto purchases as "Purchases" under its

card member agreements, and not imposing cash advance fees or interest charges — then changing

Plaintiffs' and the Class's crypto "Purchases" to be treated as "Cash Advances" overnight on

January 23, 2018 — Chase made "significant changes" to Plaintiffs' and the Class's credit card terms within the meaning of 15 U.S.C. § 1637(i)(2) and Regulation Z promulgated thereunder.

102.    Upon making this significant, overnight change to Plaintiffs' and the Class's credit card terms in January 2018, Chase did not provide advance written notice of the change as required by 15 U.S.C. § 1637(i)(2) and Regulation Z.

103.    In the alternative, Regulation Z provides as follows:

> [I]f a creditor increases any component of a charge, or introduces a new charge, required to be disclosed under § 1026.6(b)(3) that is *not* a significant change in account terms as described in paragraph (c)(2)(ii) of this section, a creditor must either, at its option:
>
> (A) Comply with the [45-day notice] requirements of paragraph (c)(2)(i) of this section; or
>
> (B) Provide notice of the amount of the charge *before the consumer agrees to or becomes obligated to pay the charge*, at a time and in a manner that a consumer would be likely to notice the disclosure of the charge.  The notice may be provided orally or in writing.

12 C.F.R. § 1026.9(c)(2)(iii).

104.    The credit card terms specifically enumerated in 12 C.F.R. § 1026.6(b)(3) include, but are not limited to, the following:

> For charges imposed as part of an open-end (not home-secured) [credit card] plan, *the circumstances under which the charge may be imposed*, [and] the amount of the charge or an explanation of how the charge is determined.

12 C.F.R. § 1026.6(b)(3)(i).

105.    Had Chase provided Plaintiffs and the Class with advance notice of these changes as required by TILA and Regulation Z, then Plaintiffs and Class members would not have used their Chase credit cards to buy cryptos from Coinbase and other merchants on or after the effective date of such changes.  Consequently, Plaintiffs and the Class would not have incurred Chase's

33

surprise "Cash Advance" fees or interest charges, effectively taking out personal cash loans from Chase without their knowledge or consent.

106.    Pursuant to 15 U.S.C. § 1640(a), Plaintiffs bring this claim on their own behalf, and on behalf of the Class defined above, to recover their and the Class's actual financial damages, plus statutory damages in the aggregate amount of $1 million, plus their costs of this action and reasonable attorneys' fees and expenses incurred therein.

**COUNT IV**
**(In the Alternative)**
**Violation of Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, Regulation Z,**
**12 C.F.R. §§ 1026.1, *et seq.* – "Basis of Disclosures"**

107.    In response to this action, Chase contends (wrongly and deceptively) that it did not change or breach the terms of the Written Contracts alleged herein, such that buying cryptos from a third-party credit card merchant *always* constituted a "similar cash-like transaction" (and thus, a "Cash Advance") under the Written Contracts.  If the Court, or a jury, after receiving evidence, ultimately agrees with Chase's deceptive, *post hoc* arguments that it never breached or changed the terms of the Written Contracts, then Plaintiffs and the Class plead as follows.

108.    TILA requires Defendant to send Plaintiffs and the Class periodic account statements.  *See generally* 15 U.S.C. § 1637(b).  The Bureau, in turn, has promulgated rules regarding the required form and contents of a creditor's periodic statements.  *See generally* 12 C.F.R. § 1026.7.  The disclosures required in Chase's periodic statements to cardholders must, at all times, accurately reflect the legal obligations between the parties.  12 C.F.R. § 1026.5(c) ("Disclosures shall reflect the terms of the legal obligations between the parties.").

109.    The Bureau's Official Interpretation of 12 C.F.R. § 1026.5(c) says, "The disclosures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures."  *See* Supplement I to 12 C.F.R. § 1026.5(c).  "The legal obligation is

34

determined by applicable state or other law." *Id.* "*The legal obligation normally is presumed to be contained in the contract that evidences the agreement*. But this may be rebutted if another agreement between the parties legally modifies the contract." *Id.* (emphasis added).

110. *If* Chase never breached or changed the contractual terms of Plaintiffs' and the Class's credit card agreements, such that buying cryptos from a third-party credit card merchant always constituted a "similar cash-like transaction" (and thus, "Cash Advance") under Plaintiffs' and the Class's card agreements, *then* Chase violated TILA's and Regulation Z's express requirement that creditors' periodic statements "reflect the terms of the legal obligations between the parties," by sending Plaintiffs and the Class periodic statements wrongly identifying their crypto transactions as "Purchases" under the agreements, when in reality, the transactions were always "Cash Advances" under the agreements.

111. Defendant's violations of TILA's and Regulation Z's requirement that periodic statements "shall reflect the terms of the legal obligations between the parties" caused Plaintiffs and the Class to remain reasonably unaware of their true legal obligations with respect to cryptocurrency purchases, thus causing Plaintiffs and the Class to make numerous, additional credit card transactions they would not otherwise have made, and to incur many additional Cash Advance fees and interest charges which they would not otherwise have incurred.

112. Pursuant to 15 U.S.C. § 1640(a), Plaintiffs bring this claim on their own behalf, and on behalf of the Class defined above, to recover their and the Class's actual financial damages, plus statutory damages in the aggregate amount of $1 million, plus their costs of this action and reasonable attorneys' fees and expenses incurred therein.

**COUNT V**
**Declaratory Judgment, 28 U.S.C. § 2201**

113.    Plaintiffs hereby repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

114.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the Class are entitled to have this Court establish by declaration their rights and legal relations under their Written Contracts with Chase.

115.    Accordingly, Plaintiffs on behalf of the Class pray for a declaration that the terms of their Written Contracts with Chase do not permit Chase to impose "Cash Advance" fees and interest charges on Plaintiffs and the Class for buying virtual currencies from third-party credit card merchants.

**CLASS ACTION ALLEGATIONS**

116.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons in the United States who, upon buying a cryptocurrency from Coinbase.com or another online cryptocurrency merchant, incurred cash advance fees or cash advance interest charges on a consumer credit card issued by Defendant Chase Bank USA, N.A.  Excluded from the Class are Chase, the officers and directors of Chase, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Chase has or had a controlling interest.

117.    The members of the Class are so numerous that joinder of all members is impracticable.  Leading up to and during January and February 2018, hundreds if not thousands of Chase credit card members used their Chase cards to purchase cryptos from Coinbase and other online crypto merchants for millions of dollars, collectively.  While the exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed

Class.   Members of the Class may be identified and located from records maintained by Chase and may be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

118.   Plaintiffs' claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law as complained of herein.

119.   Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

120.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.   whether Chase breached its Written Contracts with Plaintiffs and the Class;

      b.   whether Chase violated TILA and Regulation Z by declining to notify Plaintiffs and other Class members in advance of changing their credit terms;

      c.   whether Chase's account-opening disclosures and periodic account statements to Class members were clear and conspicuous, and not ambiguous or objectively misleading;

      d.   whether Chase's periodic account statements to Class members did or did not reflect the true terms of the legal obligations between the parties at all relevant times;

      e.   whether Plaintiffs and the Class suffered damages as a result of Chase's acts and omissions alleged herein, and the proper measure of such damages; and

f.    whether Plaintiffs and the Class are entitled to statutory damages, reasonable attorneys' fees and expenses as a result of Defendant's conduct.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult if not impossible for members of the Class to redress the wrongs done to them on an individual basis.  There will be no difficulty in the management of this case as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives, and the law firm of Finkelstein & Krinsk LLP as Class Counsel;

B.    Requiring Defendant to pay the actual damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the Class additional statutory damages in the aggregate amount of $1 million pursuant to 15 U.S.C. § 1640(a);

D.    Awarding Plaintiffs and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation;

E.    Declaring that the terms of Plaintiffs' and the Class's Written Contracts with Chase do not permit Chase to impose "Cash Advance" fees and interest charges on Class members for their purchases of virtual currencies from third-party credit card merchants; and

F.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated: August 17, 2018                             Respectfully submitted,

FINKELSTEIN & KRINSK LLP


By: ___s/ David J. Harris, Jr._____
        David J. Harris, Jr., Esq.

550 West C Street, Suite 1760
San Diego, California 92101-3579
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425
Email: djh@classactionlaw.com

*Counsel for Plaintiffs and the Putative Class*