**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BRADY TUCKER, RYAN HILTON and
STANTON SMITH, Individually and On Behalf
of All Others Similarly Situated,

                Plaintiffs,

      v.

CHASE BANK USA, N.A.,

                Defendant.

Case No. 1:18-cv-03155 (KPF)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS THE AMENDED COMPLAINT**
**PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Noah A. Levine
Stephanie Simon
Scott McAbee
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
Tel: (212) 230-8800
noah.levine@wilmerhale.com
stephanie.simon@wilmerhale.com
scott.mcabee@wilmerhale.com

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT ..................................................................................................................... 2

    A.   The Truth In Lending Act And Regulation Z ..................................................... 2

        1.   Advance notice requirement ................................................................. 2

        2.   Clear and conspicuous requirement ..................................................... 3

    B.   Plaintiffs' Account Relationships With Chase ................................................. 4

    C.   Plaintiffs' Cryptocurrency Purchases .............................................................. 4

    D.   Procedural History .......................................................................................... 5

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ...................................................................................................................... 6

   I.    The Amended Complaint Fails To State A Claim With Respect To The Change In Classification Of Plaintiffs' Cryptocurrency Transactions (Count III) ............................. 6

  II.    The Amended Complaint Fails To State A Claim With Respect To The Treatment Of Plaintiffs' Cryptocurrency Transactions As Cash Advances ........................................... 10

    A.   Plaintiffs Fail To State A Claim For Breach Of The Cardmember Agreement (Count I) ........................................................................................................ 10

    B.   Plaintiffs Fail To State A Claim For Violation Of TILA's Clear And Conspicuous Requirement (Count II) .......................................................... 14

  III.    The Amended Complaint Fails To State A Claim With Respect To The Classification Of Plaintiffs' Cryptocurrency Transactions As Purchases (Count IV) ...... 17

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................6, 17

*Barrer v. Chase Bank USA, N.A.*,
566 F.3d 883 (9th Cir. 2009) ...............................................................................15

*Bryson v. Bank of New York*,
584 F. Supp. 1306 (S.D.N.Y. 1984)....................................................................15

*Dixon v. D.H. Holmes Co.*,
566 F.2d 571 (5th Cir. 1978) .........................................................................15, 16

*In re Elevator Antitrust Litigation*,
502 F.3d 47 (2d Cir. 2007)......................................................................................6

*Ford Motor Credit Co. v. Milhollin*,
444 U.S. 555 (1980)..............................................................................................15

*Jackson v. Wells Fargo Bank, N.A.*,
No. 2:12CV1262 (DSC), 2013 WL 5945732 (W.D. Pa. Nov. 6, 2013) .................19

*Karakus v. Wells Fargo Bank N.A.*,
941 F. Supp. 2d 318 (E.D.N.Y. 2013) .................................................................15

*Palmer v. Champion Mortgage*,
465 F.3d 24 (1st Cir. 2006)...................................................................................15

*Saini v. CIGNA Life Insurance Co. of N.Y.*,
No. 17 Civ. 1922 (KPF), 2018 WL 1959551 (S.D.N.Y. Apr. 24, 2018)..............4, 6

*Santos–Rodriguez v. Doral Mortgage Corp.*,
485 F.3d 12 (1st Cir. 2007)...................................................................................15

*Schwartz v. HSBC Bank USA, N.A.*,
No. 13 CIV. 769 (PAE), 2013 WL 5677059 (S.D.N.Y. Oct. 18, 2013) .................18

*Strubel v. Capital One Bank (USA), N.A.*,
179 F. Supp. 3d 320 (S.D.N.Y. 2016)..................................................................14

*Strubel v. Comenity Bank*,
842 F.3d 181 (2d Cir. 2016)............................................................................15, 17

*Veale v. Citibank*,
  85 F.3d 577 (11th Cir. 1996), *cert. denied* 520 U.S. 1198 (1997)..........................................15

**State Cases**

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006)..........................................................................................11, 13

*Lorillard Tobacco Co. v. American Legacy Foundation*,
  903 A.2d 728 (Del. 2006) ........................................................................................................11

**Federal Statutes**

15 U.S.C. § 1601 .................................................................................................................................2

15 U.S.C. § 1632 .................................................................................................................................3

15 U.S.C. § 1637 ..........................................................................................................................2, 3, 7

Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L.
  No. 111-24, 123 Stat. 1734 (2009) ...........................................................................................2

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
  203, 124 Stat. 1376 (2010).........................................................................................................2

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .....................................................................................19

**Regulations**

12 C.F.R. § 226.9 ...............................................................................................................................3

12 C.F.R. § 1026, Supp. I, Comment 5(a)(1)-1 ...............................................................4, 14, 16

12 C.F.R. § 1026.5 ..........................................................................................................................3, 18

12 C.F.R. § 1026.6 .............................................................................................................................3

12 C.F.R. § 1026.7 ..........................................................................................................................3, 18

12 C.F.R. § 1026.9 ........................................................................................................................3, 7, 8

*Truth in Lending, Interim Final Rule*, 74 Fed. Reg. 36,077 (July 22, 2009)..................................8

## Other Authorities

Adam Levy, *What Is Cryptocurrency?*, The Motley Fool (Mar. 11, 2018, 7:15
AM), https://www.fool.com/investing/2018/03/11/what-is-
cryptocurrency.aspx ...................................................................................13

Bitcoin Basics 101, https://www.bitcoin.com/is-bitcoin-real-money ............................13

*Black's Law Dictionary* (10th ed. 2014) ...........................................................7

Cambridge Dictionary, "cash" in Business English,
https://dictionary.cambridge.org/us/dictionary/english/cash ....................................11

CFPB, Consumer Advisory, *Risks to consumers posed by virtual currencies* (Aug.
2014), https://files.consumerfinance.gov/f/201408_cfpb_consumer-
advisory_virtual-currencies.pdf ........................................................................12

Chris Juikaran, *Blockchain: Background and Policy Issues*, Congressional
Research Service (Feb. 28, 2018) ........................................................................5

Concise Oxford English Dictionary (11th ed. 2004) ..............................................11

Edward V. Murphy, M. Maureen Murphy, and Michael V. Seitzinger, *Bitcoin:
Questions, Answers, and Analysis of Legal Issues*, Congressional Research
Service (Oct. 13, 2015) ........................................................................................5

Financial Action Task Force, *Virtual Currencies: Key Definitions and Potential
AML/CFT Risks* (June 2014), http://www.fatf-
gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-
potential-aml-cft-risks.pdf ..................................................................................12

International Monetary Fund, *Back to Basics: What Is Money?*, Finance &
Development (Sept. 2012),
https://www.imf.org/external/pubs/ft/fandd/2012/09/basics.htm ...........................11

Investopedia, "cryptocurrency,"
https://www.investopedia.com/terms/c/cryptocurrency.asp ....................................12

Kenneth Rapoza, *Goldman Sachs Caves: Bitcoin Is Money*, Forbes.com (Jan. 10,
2018, 11:15 AM),
https://www.forbes.com/sites/kenrapoza/2018/01/10/goldman-sachs-caves-
bitcoin-is-money/#59c2ef9574b7 ......................................................................16

Marc Andressen, *Why Bitcoin Matters*, DealBook (Jan. 21, 2014, 11:54 AM),
https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/ ...........................16

Merriam-Webster, Definition of "cash," Noun, Entry 1, https://www.merriam-
webster.com/dictionary/cash ..............................................................................11

Merriam-Webster, Definition of "cryptocurrency," Noun, https://www.merriam-webster.com/dictionary/cryptocurrency ....................................................................................12

Merriam-Webster, Definition of "like," Preposition, Definition 1a, https://www.merriam-webster.com/dictionary/like ..................................................................12

Merriam-Webster, Definition of "money," Noun, Entry 1, Definition 1, https://www.merriam-webster.com/dictionary/money .............................................................11

Oxford Living Dictionaries, Main definitions of "cash" in English, Noun, Definition 1.1, https://en.oxforddictionaries.com/definition/cash ...........................................11

Paul Gil, *What Are Bitcoins? How Do Bitcoins Work?*, Lifewire (Aug. 22, 2018), https://www.lifewire.com/what-are-bitcoins-2483146 ............................................................16

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 2008), https://bitcoin.org/bitcoin.pdf ......................................................................................2, 12, 13

Steve Fiorillo, *How to Use Bitcoin for Purchases*, TheStreet (Apr. 18, 2018, 11:13 AM), https://www.thestreet.com/investing/bitcoin/what-can-you-buy-with-bitcoin-14556706 ......................................................................................................................16

Tal Yellin, Dominic Aratari, and Jose Pagilery, *What is bitcoin?*, CNN Money (published Dec. 2013; updated Aug. 8, 2018), https://money.cnn.com/infographic/technology/what-is-bitcoin/index.html ...........................16

## INTRODUCTION

In his original complaint, Brady Tucker asserted a single claim against Chase Bank USA, N.A. ("Chase"), alleging that Chase violated the Truth in Lending Act ("TILA") and its implementing regulation, Regulation Z, by failing to provide him additional disclosures before charging cash-advance fees and interest on his cryptocurrency purchases.  After Chase moved to dismiss that complaint, Mr. Tucker and two new Plaintiffs filed an amended complaint, which reasserts Mr. Tucker's original claim and pleads additional claims in the alternative.  None states a claim upon which relief can be granted.

Plaintiffs' claim for violation of TILA's advance-notice requirement fails because the requirement has no application here.  The advance-notice requirement, under which creditors must provide 45 days' advance notice of significant changes in account terms, applies only when a creditor changes the actual terms of the parties' cardmember agreement.  Here, Plaintiffs do not and cannot allege that Chase ever changed the terms of their credit card contracts.  To the contrary, the amended complaint affirmatively alleges that the relevant purchase and cash-advance terms were always part of that contract—before, during, and after Plaintiffs' cryptocurrency purchases.

Plaintiffs' new claims fare no better.  The claims for breach of contract and violation of the TILA "clear and conspicuous" requirement both rest on Plaintiffs' assertion that the virtual currency (or cryptocurrency) that they purchased is not "cash-like."  For that reason, Plaintiffs argue, the "cash-like transactions" provision in the Chase cardmember agreement gave the bank no authority to charge Plaintiffs cash-advance fees and interest for their cryptocurrency transactions and, for purposes of TILA, was not "clear and conspicuous."  Those claims have no merit because cryptocurrency is "like" "cash."  "Cash" is commonly understood to mean "money"—*i.e.*, something that operates as a medium of exchange, a measure of value, or a

1

means of payment.  Cryptocurrency is all of these things.  It is thus well recognized that cryptocurrency is a form of electronic cash or, at minimum, certainly like cash.  Indeed, the inventor of Bitcoin—the first cryptocurrency—described his invention in precisely these terms: "A purely peer-to-peer version of electronic cash."[1]  Accordingly, Plaintiffs' breach-of-contract and TILA claims fail.  The amended complaint should be dismissed.

## STATEMENT

### A.     The Truth In Lending Act And Regulation Z

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, as amended by the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act"), Pub. L. No. 111-24, 123 Stat. 1734, 1735-36 (2009), governs credit-card issuers' disclosure obligations with respect to card accounts.  Two provisions of TILA are pertinent here: the "advance notice" requirement and the "clear and conspicuous" requirement.

### 1.     Advance notice requirement

TILA requires that card issuers give cardholders 45 days' advance notice of significant changes in the terms of their credit card contracts.  Specifically, the statute provides:

> In the case of any credit card account under an open end consumer credit plan, a creditor shall provide a written notice of any *significant change*, as determined by rule of the Bureau, *in the terms ... of the cardholder agreement* between the creditor and the obligor, not later than 45 days prior to the effective date of the change.

15 U.S.C. § 1637(i)(2) (emphases added).

Regulation Z[2]—which implements TILA—likewise provides that "when a significant change in account terms . . . is made, a creditor must provide a written notice of the change at

---

[1] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 2008), https://bitcoin.org/bitcoin.pdf.

[2] In sections 1061 and 1100A of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2036, 2107-09 (2010), Congress transferred TILA rulemaking responsibility from the Federal Reserve Board to the Consumer Financial Protection

least 45 days prior to the effective date of the change."  12 C.F.R. § 1026.9(c)(2)(i)(A).[3]  The regulation further defines a "significant change in account terms" to mean "a change to a term" that Regulation Z requires to be disclosed upon the opening of the credit-card account, at the outset of the creditor-cardholder relationship, including the annual percentage rates ("APRs") for purchases and cash advances, the types of transactions to which those APRs apply, and cash advance fees.  *See id.* §§ 1026.9(c)(2)(ii); 1026.6(b)(2)(i), (b)(2)(vii), & (b)(4)(i).

### 2.  Clear and conspicuous requirement

TILA and Regulation Z require card issuers to disclose various information to consumers in connection with the extension of credit, including (as relevant here) the rates used to calculate interest and the type of transaction to which each rate applies.  *See* 15 U.S.C. § 1637(a); 12 C.F.R. § 1026.6(b)(4).  TILA and Regulation Z further mandate that card issuers make those required disclosures "clearly and conspicuously."  15 U.S.C. § 1632(a) ("Information required by this subchapter shall be disclosed clearly and conspicuously, in accordance with Regulations of the Bureau."); 12 C.F.R. § 1026.5(a)(1)(i) ("The creditor shall make the disclosures required by this subpart clearly and conspicuously.").[4]  The Official Staff Commentary to Regulation Z interprets "clear and conspicuous" to mean that disclosures must be (1) reasonably

---

Bureau.  Both before and after that transfer, the regulation implementing TILA has been known as Regulation Z.

[3] Following the enactment of the CARD Act, the Federal Reserve Board promulgated a regulation implementing the advance-notice requirement.  That regulation, originally implemented as 12 C.F.R. § 226.9(c)(2), is now found in the regulations of the Consumer Financial Protection Bureau at 12 C.F.R. § 1026.9(c)(2).

[4] Card issuers are also required to send consumers a periodic statement that discloses, among other things, "each periodic rate that may be used to compute the interest charge expressed as an annual percentage rate and using the term *Annual Percentage Rate*, along with the range of balances to which it is applicable" and "[t]he types of transactions to which the periodic rates apply."  12 C.F.R. § 1026.7(b)(4)(i).

understandable (*i.e.*, "clear") and (2) noticeable to the consumer (*i.e.*, "conspicuous").  12 C.F.R. § 1026, Supp. I, comment 5(a)(1)-1.

### B.    Plaintiffs' Account Relationships With Chase

Plaintiffs are Chase credit-card accountholders.  *See* Plaintiffs' First Amended Complaint ("FAC"), ECF No. 30, ¶¶ 13-15.  Plaintiffs' credit-card account relationships with Chase are governed by a Cardmember Agreement.  *See id.* ¶ 36; *see also* FAC, Ex. A ("CMA").[5]

That agreement prescribes the interest rates and fees applicable to different types of credit-card transactions—including, as relevant here, purchases and cash advances.  FAC ¶ 36; *see also* CMA, Rates and Fees Table.  The agreement then defines those transactions in easy-to-understand terms.  *See* CMA at 3.  With respect to "Cash Advances," the agreement provides that in addition to standard ATM withdrawals and cash advance checks, certain "Cash-like Transactions"—including "purchasing travelers checks, foreign currency, money orders, wire transfers *or similar cash-like transactions*"—"will be treated as cash advances," and accordingly may be subject to cash-advance interest rates and fees.  FAC ¶ 39; CMA at 2 (emphasis added).

As the amended complaint properly alleges, these terms of Plaintiffs' credit-card contracts relating to cash advances have not changed.  The provisions have been part of Plaintiffs' CMAs "[a]t all relevant times."  FAC ¶ 36.

### C.    Plaintiffs' Cryptocurrency Purchases

In late 2017 and early 2018, Plaintiffs used their Chase credit cards to purchase "cryptocurrency" or "virtual currency" from Coinbase, Inc. ("Coinbase"), an online cryptocurrency seller.  FAC ¶¶ 4, 7.  Cryptocurrencies, such as Bitcoin, Litecoin, and Ethereum,

---

[5] Because the FAC relies on, refers to, and quotes the Chase Cardmember Agreement, this Court may consider it in deciding this motion to dismiss.  *See, e.g.*, *Saini v. CIGNA Life Ins. Co. of N.Y.*, No. 17 Civ. 1922 (KPF), 2018 WL 1959551, at *1 n.1 (S.D.N.Y. Apr. 24, 2018).

are currencies that can be bought, sold, traded, and converted into cash through virtual exchanges.  Like other forms of currency (including the U.S. dollar), cryptocurrencies can be used to purchase goods and services,[6] but have no intrinsic value.[7]  Unlike traditional forms of currency, cryptocurrencies exist only in electronic form (with no physical manifestation) and are not centrally managed.[8]

Plaintiffs allege that until January 22, 2018, Chase processed their cryptocurrency transactions as "Purchases" and assessed no transaction fees, but that between January 23 and February 2, 2018, Chase processed their cryptocurrency purchases as "Cash Advances" subject to cash-advance interest rates and fees.  FAC ¶¶ 7-8, 47-55.

### D.    Procedural History

Brady Tucker filed his original complaint on April 10, 2018.  ECF No. 1.  He asserted one claim for violation of TILA and Regulation Z.  The complaint alleged that when Chase classified his cryptocurrency transactions as "Cash Advances," Chase violated provisions of TILA and Regulation Z that require credit-card issuers to give cardholders 45 days' written notice before making a change to the terms of the contract governing the credit-card relationship. On July 27, 2018, Chase moved to dismiss the complaint.  ECF No. 23-24.

On August 17, 2018, Mr. Tucker and two additional Plaintiffs filed the amended complaint, which reasserts—on behalf of themselves and a putative class of similarly-situated individuals—Mr. Tucker's original TILA claim.  The amended complaint also adds new claims,

---

[6] *See* Chris Juikaran, *Blockchain: Background and Policy Issues*, Congressional Research Service (Feb. 28, 2018) at 5 ("Cryptocurrencies . . . are built to allow the exchange of some digital asset of value (the cryptocurrency) for a good or service.").

[7] Edward V. Murphy, M. Maureen Murphy, and Michael V. Seitzinger, *Bitcoin: Questions, Answers, and Analysis of Legal Issues*, Congressional Research Service (Oct. 13, 2015), at 1.

[8] *Id.*

under which Plaintiffs allege that by treating their cryptocurrency purchases as cash advances, Chase (1) breached the terms of the credit card agreement and (2) violated the clear and conspicuous requirement of TILA and Regulation Z.  Plaintiffs also allege in the alternative that Chase violated TILA and Regulation Z by labeling their initial cryptocurrency transactions as "Purchases" on their periodic statements.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (internal quotation marks omitted).  Instead, the complaint must allege enough facts to "nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Saini v. Cigna Life Ins. Co. of New York*, No. 17 CIV. 1922 (KPF), 2018 WL 1959551, at *4 (S.D.N.Y. Apr. 24, 2018) (same).

## ARGUMENT

**I.     The Amended Complaint Fails To State A Claim With Respect To The Change In Classification Of Plaintiffs' Cryptocurrency Transactions (Count III)**

Plaintiffs advance-notice claim under TILA rests on the allegation that by *first* treating Plaintiffs' cryptocurrency purchases as "Purchases" but *then* classifying later cryptocurrency purchases as "Cash Advances," Chase made a "significant . . . change to Plaintiffs' and the Class's credit card terms" requiring "advance written notice."  FAC ¶ 102.  That allegation fails to state a claim, however, because Plaintiffs do not and cannot allege that Chase changed any

written *term* of their Chase CMAs.  Instead, Plaintiffs' focus is on Chase's *actions* under the contract, alleging that Chase inconsistently classified their cryptocurrency purchases.  As the statute, regulation, and regulatory history all make clear, however, TILA's advance-notice requirement applies only to changes that a creditor makes to a term of its written agreement with its cardholder.

To start, the statutory provision setting forth the advance-notice requirement refers specifically and only to the "terms" of the cardholder agreement.  The statute provides that, "[i]n the case of any credit card account under an open end consumer credit plan, a creditor shall provide a written notice of any significant change, as determined by rule of the Bureau, in *the terms . . . of the cardholder agreement* between the creditor and the obligor."  15 U.S.C. § 1637(i)(2) (emphasis added).  The Regulation Z provision implementing § 1637(i)(2) likewise states that "when a significant change *in account terms* . . . is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change."  12 C.F.R. § 1026.9(c)(2)(i)(A) (emphasis added).

Both provisions, by their express text, refer to terms of the actual credit card contract between the creditor (here, Chase) and the cardholder.  The statute speaks specifically of "the cardholder agreement" and both the statute and regulation use the word "term"—as in a "term[] . . . of the cardholder agreement" and an "account term[]."  The meaning of the word "term," in the legal context, is "[a] contractual stipulation" or a "[p]rovision[] that defines an agreement's scope."  *Black's Law Dictionary* (10th ed. 2014) (definition of "term").  Both this plain meaning of "term" and the fact that the statute pairs it with "the cardholder agreement" make clear that TILA and Regulation Z refer to a change in an actual provision of the credit-card contract.

7

The structure of 12 C.F.R. § 1026.9 also refutes Plaintiffs' argument.  Section 1026.9 makes a distinction between a "significant change in account terms"—which is covered by § 1026.9(c)(2), the provision upon which Plaintiffs rely—and rate increases "that are not due to a change in the contractual terms of the consumer's account"—which are covered by a different subsection, § 1026.9(g).  12 C.F.R. § 1026.9(c)(2)(i)(A).  In its rulemaking, the Federal Reserve explained "[t]he distinction between these types of changes":  § 1026.9(c) "addresses *changes in* the underlying terms of the agreement" while § 1026.9(g) "addresses *changes* in a rate being applied to a consumer's account *consistent with* the existing terms of the cardholder agreement." Board of Governors of the Federal Reserve System, *Truth in Lending, Interim Final Rule*, 74 Fed. Reg. 36,077, 36,082 n.13 (July 22, 2009) (emphases added).  Put differently, § 1026.9(c) "is intended to cover *changes in contract terms*" while § 1026.9(g) concerns APR increases resulting from "*the application of existing provisions in the cardholder agreement*."  *Id.* at 36,084 (emphases added).  The contrast between the two subsections clarifies the scope of § 1026.9(c)(2), which is limited to changes in the contractual terms of the consumer's account, and demonstrates that when the Federal Reserve meant to require notice before application of an existing contract term, it knew how to do so.  The Federal Reserve's explanation thus confirms that TILA's advance-notice requirement applies only to changes in the terms of the actual credit-card agreement.

Here, the amended complaint does not, and cannot, allege that Chase made a *change* to the contractual cash-advance term in Plaintiffs' credit card account agreements.  To the contrary, the amended complaint alleges that "[a]t all relevant times," the CMA stated that Chase "treat[s] certain other transactions as cash advances" and referred the cardholder specifically to "the Cash-like Transactions section" of the agreement.  FAC ¶¶ 36, 38.  That section provides, in

turn, that Chase will treat the following transactions as cash advances: "purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions." *Id.* ¶ 39.  Thus, as the amended complaint itself correctly alleges, this term of Plaintiffs' credit-card agreements did not change.

Plaintiffs' claim rests instead on what Plaintiffs perceive to be a change in Chase's *application* of the existing "cash-like transactions" provision of the CMA to Plaintiffs' cryptocurrency purchases.  *See* FAC ¶¶ 98-106.  Plaintiffs contend that Chase's classification of some transactions as cash advances, after not classifying others the same way, constitutes a change in the terms of the CMA.  *See id.* ¶ 101.  Yet the fact that Chase did not charge a cash-advance fee or APR on certain of Plaintiffs' cryptocurrency purchases cannot render that classification an actual term of the contract, prohibiting Chase thenceforth from applying the "cash-like transactions" term in Plaintiffs' written agreement to Plaintiffs' cryptocurrency purchases.  Chase is not aware of any authority for the proposition that a creditor's failure to exercise a contractual right under its credit-card agreement—here, Chase's initial failure to exercise its right under the CMA to charge the Cash Advance APR for cryptocurrency purchases—creates a new contractual restriction, such that if the creditor later avails itself of that right under the terms of the unchanged written contract, that action will be considered a change in the terms of the credit card account agreement triggering § 1026.9(c)'s advance-notice requirement.  Indeed, Plaintiffs' CMAs provides precisely the opposite.  The CMA provides that Chase "may enforce the terms of this agreement *at any time*" and specifically "may delay enforcement *without losing our right to enforce this agreement at a later time*."  CMA at 9 (emphases added).  The plain language of the CMA thus undermines any assertion that Chase's

delay in treating Plaintiffs' cryptocurrency purchases as cash advances resulted in a change in Chase's contractual rights.

In sum, the advance-notice requirement is triggered only by a change in the actual terms of the credit card account agreement. Here, Plaintiffs allege no change in the terms of their CMAs and, as noted, allege precisely the opposite—that the "cash-like transaction" provision was in effect "[a]t all relevant times." FAC ¶ 36. The truth of this allegation is not in dispute: Chase did not change its cash-advance contract terms. Plaintiffs' TILA claim for failure to provide advance notice of that (nonexistent) change therefore necessarily fails.

## II.    The Amended Complaint Fails To State A Claim With Respect To The Treatment Of Plaintiffs' Cryptocurrency Transactions As Cash Advances

Perhaps recognizing that no claim lies for Chase's alleged *change* in classification of their cryptocurrency purchases, Plaintiffs now try a different tack, focusing instead on Chase's right to classify their cryptocurrency transactions as cash advances *in the first instance* and Chase's disclosure of that right. These new claims fare no better.

### A.    Plaintiffs Fail To State A Claim For Breach Of The Cardmember Agreement (Count I)

First, Plaintiffs allege that the CMA grants Chase no right to charge cash-advance fees and interest with respect to cryptocurrency purchases, and that Chase therefore breached the agreement by charging such fees and interest. FAC ¶¶ 84-89. Plaintiffs' contract theory rests on the assertion that cryptocurrency is "not money" because it is not "fiat" currency or generally-accepted "legal tender." *Id.* ¶¶ 18, 20. That is so, Plaintiffs assert, because "no government has a sovereign monopoly on the creation of cryptocurrencies" and the government "does not accept payment for taxes or other obligations . . . in 'virtual currency.'" *Id.* ¶¶ 21-22.

That theory, however, is foreclosed by the express terms of the agreement. In defining the types of transactions that can incur a cash-advance fee and interest, the agreement does not

use the term "fiat currency" or "cash transactions."  Rather, the agreement states that cash-advance fees and interest shall apply to "*cash-like* transactions"—*i.e.*, transactions for things that are not cash, but are *like* cash.  CMA at 3 (emphasis added).

The term "cash-like transaction[]" includes cryptocurrency transactions because cryptocurrency is "like" cash.  *See Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (in determining the plain meaning of a contractual term, the court may refer to the "ordinary dictionary meaning").[9]  The term "cash" is commonly understood to mean "money,"[10] and "money," in turn, is "something generally accepted as a medium of exchange, a measure of value, or a means of payment."[11]  Indeed, "money can be anything that can serve as a store of value . . .; unit of account . . .; or medium of exchange, something that people can use to buy and sell from one another."[12]

---

[9] The CMA contains a choice-of-law provision selecting Delaware law.  *See* CMA at 9 ("This agreement and your account will be governed by federal law, as well as the law of Delaware[.]").

[10] *See* Merriam-Webster, Definition of "cash," Noun, Entry 1, https://www.merriam-webster.com/dictionary/cash (defining "cash" to mean "ready money" or "money or its equivalent (such as a check) paid for goods or services at the time of purchase or delivery"); Oxford Living Dictionaries, Main definitions of "cash" in English, Noun, Definition 1.1, https://en.oxforddictionaries.com/definition/cash (defining "cash" to mean "money in any form"); Concise Oxford English Dictionary 218 (11th ed. 2004) (defining "cash" to mean "money in any form as an available resource"); Cambridge Dictionary, "cash" in Business English, https://dictionary.cambridge.org/us/dictionary/english/cash (defining "cash" to mean "money in general, especially money that is available to use immediately").

[11] Merriam-Webster, Definition of "money," Noun, Entry 1, Definition 1, https://www.merriam-webster.com/dictionary/money.

[12] International Monetary Fund, *Back to Basics: What Is Money?*, Finance & Development (Sept. 2012), https://www.imf.org/external/pubs/ft/fandd/2012/09/basics.htm.

Cryptocurrency possesses all these key attributes of "money" and is thus, at minimum, "like" it.[13]  As the name "cryptocurrency" itself suggests and Plaintiffs themselves recognize, *see* FAC ¶ 29 (describing cryptocurrencies "as digital units of 'currency'"), cryptocurrency is simply an alternative form of currency—specifically, a "form of currency . . . that . . . exists digitally."[14] Cryptocurrency stores value and can be used to make purchases at thousands of businesses in the United States.  Indeed, cryptocurrencies were invented to serve as a medium of exchange, so that users can buy and sell from one another without reliance on government legal tender or financial institutions.  As the inventor of Bitcoin explained in a 2008 paper proposing the "Peer-to-Peer Electronic Cash System": "What is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party."[15]  Today, cryptocurrency (or virtual currency) is universally recognized as a medium of exchange that operates like money (in other words, like cash):

- Government: "Virtual currencies are a kind of electronic money."  CFPB, Consumer Advisory, *Risks to consumers posed by virtual currencies* (Aug. 2014), at 1, https://files.consumerfinance.gov/f/201408_cfpb_consumer-advisory_virtual-currencies.pdf.

- Finance: "Virtual currency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."  Financial Action Task Force, *Virtual Currencies: Key Definitions and Potential AML/CFT Risks*

---

[13] *See* Merriam-Webster, Definition of "like," Preposition, Definition 1a, https://www.merriam-webster.com/dictionary/like ("having the characteristics of: similar to")

[14] Merriam-Webster, Definition of "cryptocurrency," Noun, https://www.merriam-webster.com/dictionary/cryptocurrency.  *See also* Investopedia, "cryptocurrency," https://www.investopedia.com/terms/c/cryptocurrency.asp ("A cryptocurrency is a digital or virtual currency that uses cryptography for security.").

[15] Nakamoto, *supra* n.1.

(June 2014), at 4, http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.

- Press: "Cryptocurrency is an *electronic cash system* that doesn't rely on central banks or trusted third parties to verify transactions and create new units. Instead, it uses cryptography to confirm transactions on a publicly distributed ledger called the blockchain, enabling direct peer-to-peer payments." Adam Levy, *What Is Cryptocurrency?*, The Motley Fool (Mar. 11, 2018, 7:15 AM), https://www.fool.com/investing/2018/03/11/what-is-cryptocurrency.aspx (emphasis added).

Because cryptocurrency is an alternative form of currency, purchasing cryptocurrency is "similar" to the other "cash-like transactions" listed in the CMA as subject to cash-advance fees and interest. *See* CMA at 2 ("The following transactions will be treated as cash advances: purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions"). Like a Chase cardholder who purchases travelers checks or money orders (*i.e.*, instruments that can be converted into cash or used themselves to make purchases), or a cardholder who purchases other forms of currency (*i.e.*, foreign currency), Plaintiffs' cryptocurrency purchases fall squarely within the CMA's definition of "cash-like transactions." Lest there is any doubt, the words of Bitcoin's inventor dispel it; he describes his own invention as a "peer-to-peer version of *electronic cash*."[16]

In sum, cryptocurrency is like cash. And because the agreement grants Chase the authority to charge cash-advance fees and interest for "cash-like transactions"—not for "fiat" currency transactions, as Plaintiffs would have it—Chase's charging of such fees and interest for Plaintiffs' cryptocurrency purchases was fully authorized by and consistent with the agreement. Plaintiffs' contract claim should be dismissed.[17] *See Allied Capital*, 910 A.2d at 1030

---

[16] Nakamoto, *supra* n.1 (emphasis added); *see also* Bitcoin Basics 101, https://www.bitcoin.com/is-bitcoin-real-money ("Is Bitcoin Real Money? Short answer: Yes, Bitcoin is money.").

[17] Plaintiffs assert in conclusory fashion that Chase's application of cash-advance fees and

(dismissing contract claim, finding that defendant had "complied with the express terms" of the contract, the meaning of which was "unambiguous").

**B.      Plaintiffs Fail To State A Claim For Violation Of TILA's Clear And Conspicuous Requirement (Count II)**

Plaintiffs' TILA "clear and conspicuous" claim rests on the same faulty premise as their contract claim—that cryptocurrency purchases are not cash-like transactions.  Plaintiffs allege that Chase's disclosure in the CMA that cash-advance fees and interest apply to "cash-like transactions" fails to "clearly and conspicuously" disclose the type of transactions to which the cash-advance interest rate applies.  *See* FAC ¶¶ 90-97.  However, the disclosure in the CMA is readily noticeable (*i.e.*, conspicuous) and explains, using the reasonably understandable (*i.e.*, clear) categorical term "cash-like," that several transactions beyond simply ATM withdrawals will be treated as cash advances.  Further, the CMA also provides examples, explaining that a "cash advance" extends to a broad array of transactions, including "purchasing travelers checks, foreign currency, money orders, wire transfers" and other "similar" transactions.  Accordingly, the disclosure is fully consistent with the requirements of TILA and Regulation Z.

TILA's mandate that required terms be "clearly" disclosed "generally requires that disclosures be in a reasonably understandable form."  12 C.F.R. § 1026, Supp. I, comment 5(a)(1)-1.  Whether a disclosure is "reasonably understandable" is judged by an objective—not subjective—standard.  *See, e.g.*, *Strubel v. Capital One Bank (USA), N.A.*, 179 F. Supp. 3d 320, 325 (S.D.N.Y. 2016) ("The Court evaluates the adequacy of TILA disclosures from the vantage point of a hypothetical average consumer—a consumer who is neither

---

interest to their cryptocurrency purchases also breached "the implied covenant of good faith and fair dealing," but fail to specify how.  FAC ¶ 89.  In any event, Plaintiffs' good faith and fair dealing claim—to the extent they assert one—fails for the same reason as their contract claim.

particularly sophisticated nor particularly dense." (internal quotation marks omitted)); *see also Karakus v. Wells Fargo Bank N.A.*, 941 F. Supp. 2d 318, 330 (E.D.N.Y. 2013) (same). "Clear and conspicuous disclosures, therefore, are disclosures that a reasonable cardholder would notice and understand." *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009); *see also Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006) (adequacy of disclosure depends on "whether the average consumer, looking at the [disclosure] objectively, would find it confusing").

The Second Circuit and its sister courts have emphasized that TILA "does not require perfect disclosure, but only disclosure which clearly reveals to consumers the cost of credit." *Strubel v. Comenity Bank*, 842 F.3d 181, 199 (2d Cir. 2016) (quoting *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 118 (2d Cir. 1983)); *see also, e.g., Santos–Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12, 16-17 (1st Cir. 2007) (collecting cases and noting that "[m]ost courts have concluded that the TILA's clear and conspicuous standard is less demanding than a requirement of perfect notice"); *Veale v. Citibank*, 85 F.3d 577, 580 (11th Cir. 1996) ("TILA does not require perfect notice; rather it requires a clear and conspicuous notice . . . ."), *cert. denied* 520 U.S. 1198 (1997). Consistent with the statute's purpose of ensuring "meaningful disclosure of credit terms," *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601), TILA requires card issuers to provide disclosures that, when viewed in their totality, are comprehensible to the average consumer. As the Fifth Circuit has explained, in assessing whether a particular disclosure is clear, "[t]he question is not whether [the notice provided under TILA] is capable of semantic improvement but whether it contains a substantial and accurate disclosure." *Dixon v. D.H. Holmes Co.*, 566 F.2d 571, 573 (5th Cir. 1978); *see also Bryson v. Bank of New York*, 584 F. Supp. 1306, 1312 (S.D.N.Y. 1984) ("In evaluating the Bank's

compliance with the 'clearly, conspicuously, in meaningful sequence' disclosure requirement of [TILA], it must be remembered that the Bank's disclosure need not be so clear that it cannot be improved upon." (citing *Dixon*, 566 F.2d at 572-73)).

Here, Chase used the clear, categorical term "cash-like" paired with a series of examples to describe in broad terms the types of transactions it would treat as cash advances. That disclosure is "reasonably understandable," 12 C.F.R. § 1026, Supp. I, comment 5(a)(1)-1, and more than sufficient to inform the average consumer of the type of transactions subject to cash-advance interest rates and fees. As explained in detail above, cryptocurrency is indisputably "cash-like," in that it shares the characteristics of money and can be used as a form of digital currency. *See supra* pp.11-13. Cryptocurrency is routinely characterized in the press as "currency" or in similar terms and it is exalted for its use as a medium of exchange.[18] And again, cryptocurrency is "similar" to the other "cash-like transactions" listed in the CMA. Like purchases of instruments that are easily convertible to cash, or purchases of other forms of

---

[18] *See, e.g.*, Tal Yellin, Dominic Aratari, and Jose Pagilery, *What is bitcoin?*, CNN Money (published Dec. 2013; updated Aug. 8, 2018), https://money.cnn.com/infographic/technology/what-is-bitcoin/index.html ("Bitcoin is a new currency … [that] can be used to book hotels on Expedia, shop for furniture on Overstock and buy Xbox games."); Marc Andressen, *Why Bitcoin Matters*, DealBook (Jan. 21, 2014, 11:54 AM), https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/ (describing Bitcoin as "a digital currency" that "can be used entirely as a payment system"); Kenneth Rapoza, *Goldman Sachs Caves: Bitcoin Is Money*, Forbes.com (Jan. 10, 2018, 11:15 AM), https://www.forbes.com/sites/kenrapoza/2018/01/10/goldman-sachs-caves-bitcoin-is-money/#59c2ef9574b7 (noting that prominent investors like Goldman Sachs had recognized Bitcoin "as a form of money" and that Bitcoin was recognized "as a method of payment" online and in many developing economies); Steve Fiorillo, *How to Use Bitcoin for Purchases*, TheStreet (Apr. 18, 2018, 11:13 AM), https://www.thestreet.com/investing/bitcoin/what-can-you-buy-with-bitcoin-14556706 (noting that Bitcoin "as the 'coin' in the name implies, [is] a form of currency" that was designed "to help you pay for things without banks getting involved at all" and that "there are a variety of places that will accept it as payment"); Paul Gil, *What Are Bitcoins? How Do Bitcoins Work?*, Lifewire (Aug. 22, 2018), https://www.lifewire.com/what-are-bitcoins-2483146 ("*Cryptocurrencies* are just lines of computer code that hold monetary value. . . . [It] is a form of digital public money . . . [that] you can exchange . . . for cash.").

currency, purchases of cryptocurrency fall squarely within the definition of "cash-like transactions."  Thus, a reasonable consumer would not be confused as to whether cryptocurrency purchases would be treated as cash advances under the CMA.  *See Strubel*, 842 F.3d at 199 (rejecting argument that disclosure "could mislead an average consumer" because "[a]n average consumer would readily understand the word 'purchase' . . . to bear its ordinary meaning").

Plaintiffs' assertion that Chase's disclosures "would leave the reasonable consumer unclear and misled" is conclusory.  FAC ¶ 93.  The amended complaint is devoid of factual allegations to support any inference that the "hypothetical average consumer" would fail to understand that cryptocurrency is "cash-like" or that cryptocurrency purchases would be treated as "similar" to purchases of other types of currency under the CMA.  Plaintiffs thus fail a basic requirement: they fail to plausibly allege that an average consumer would fail to understand that purchasing cryptocurrency is a "cash-like transaction" subject to the cash-advance interest rate and fees.  *See generally Iqbal*, 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement" insufficient to support complaint).  Plaintiffs' clear and conspicuous claim should be dismissed.[19]

## III.    The Amended Complaint Fails To State A Claim With Respect To The Classification Of Plaintiffs' Cryptocurrency Transactions As Purchases (Count IV)

Finally, Plaintiffs assert in the alternative that the Chase periodic statements categorizing their initial cryptocurrency transactions as purchases rather than as cash advances violated Regulation Z's mandate that the disclosures required by the statute "accurately reflect the legal

---

[19] Plaintiffs also appear to allege that the periodic statements Chase sent them, which identify some cryptocurrency transactions as "Purchases" and others as "Cash Advances," somehow render the disclosures in the CMA—an entirely separate document—unclear.  FAC ¶¶ 94-96.  The question is whether the required account-opening disclosures on their face are "clear and conspicuous" such that a reasonable consumer would be able to comprehend them.  Statements on a periodic statement received months (or perhaps even years) later cannot alter that analysis.

obligations between the parties."  FAC ¶¶ 107-112.  That claim, which effectively argues that Chase treated Plaintiffs' initial cryptocurrency purchases *too well*, has no merit.

TILA and Regulation Z require the disclosure only of certain, identified items in a periodic statement.  Card issuers are required to disclose, among other things, "[a]n identification of each credit transaction" during the previous billing cycle, 12 C.F.R. § 1026.7(b)(2); "each periodic rate that may be used to compute the interest charge expressed as an annual percentage rate . . . along with the range of balances to which it is applicable," *id.* § 1026.7(b)(4); and the "amount of the balance to which a periodic rate was applied and an explanation of how that balance was determined," *id.* § 1026.7(b)(5).  Regulation Z further provides, as it does of all required disclosures, that the disclosures must be "clear[] and conspicuous[]" and that they must accurately reflect the "legal obligation between the parties."  *Id.* §§ 1026.5(a)(1)(i) & (c).

Here, the amended complaint does not allege that Chase failed to make any of the required disclosures in the periodic statements Chase sent to Plaintiffs.  To the contrary, the amended complaint alleges that Chase sent Plaintiffs periodic statements labeling their initial cryptocurrency transactions as "Purchases" in late 2017 and early 2018—and that Chase in fact charged Plaintiffs the APR corresponding to purchases under the CMA for those transactions. *See* FAC ¶¶ 47, 50, 53.  Accordingly, even accepting the allegations in the amended complaint as true, the challenged periodic statements set forth the required disclosures and those disclosures accurately reflected the "legal obligation" that Plaintiffs had to Chase with respect to those transactions—*i.e.*, what Chase at that time required Plaintiffs to pay.  *Cf. Schwartz v. HSBC Bank USA, N.A.*, No. 13 CIV. 769 (PAE), 2013 WL 5677059, at *2, *6 (S.D.N.Y. Oct. 18, 2013) (rejecting claim that disclosures failed to reflect the "legal obligation between the parties," noting that plaintiff failed to allege that HSBC "actually *charged* him an incorrect APR on any of his

18

statements").  Unlike TILA claims allowed to proceed on this theory, Plaintiffs' claim here

simply does not identify any "legal obligation" that Chase imposed on them contrary to the

Chase CMA.  *See, e.g.*, *Jackson v. Wells Fargo Bank, N.A.*, No. 2:12CV1262 (DSC), 2013 WL

5945732, at *7 (W.D. Pa. Nov. 6, 2013) (complaint stated claim by alleging that bank

"requir[ed] plaintiffs to purchase flood insurance on their property after the parties signed a

TILA disclosure indicating that such insurance was not required").[20]

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed with prejudice

under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Dated:  November 2, 2018

Respectfully submitted,

*/s/ Noah A. Levine*
Noah A. Levine
Stephanie Simon
Scott McAbee
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
212-230-8800
noah.levine@wilmerhale.com
stephanie.simon@wilmerhale.com
scott.mcabee@wilmerhale.com

*Attorneys for Defendant Chase Bank USA, N.A.*

---

[20] Plaintiffs also seek a declaratory judgment stating that their CMAs do not permit Chase to impose cash-advance fees and interest charges on cryptocurrency purchases.  FAC ¶¶ 113-115 (Count V).  For the reasons explained (*supra* pp.10-14), the CMA expressly permits Chase to impose cash-advance fees and interest charges on cash-like transactions such as cryptocurrency purchases; accordingly, this claim too should be dismissed.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2018, I electronically filed the foregoing with the
Clerk of the Court through the CM/ECF system, which will send notices of electronic filing to all
counsel of record.

<u>/s/ Noah A. Levine</u>
Counsel of Record