**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRADY TUCKER, RYAN HILTON and STANTON SMITH, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:18-cv-03155-KPF |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT** |
| v. | |
| CHASE BANK USA, N.A., | |
| Defendant. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    LEGAL BACKGROUND ........................................................................................... 1

III.   STATEMENT OF FACTS ........................................................................................... 3

IV.    MOTION TO DISMISS STANDARDS ..................................................................... 5

    A.   General Rule 12(b)(6) Standard ............................................................................ 5

    B.   Defendant's Reliance On The "Satoshi" White Paper And Other Extraneous Sources Is Procedurally Improper At This Pleading Stage ........................................................ 6

V.     ARGUMENT ................................................................................................................ 7

    A.   As A Matter Of Contract, The Parties Agreed That Buying "Virtual Currency" Would Constitute A "Purchase" Transaction ........................................................... 7

    B.   Defendant Never Clearly Disclosed That Buying "Virtual Currency" Would Constitute A "Cash Advance" Transaction ......................................................................... 12

        1.   The Purpose And Statutory Structure Of TILA's Disclosure Requirements ................. 12

        2.   Defendant Violated TILA Because It Changed "The Types Of Transactions" To Which Cash Advance Rates Applied, In A Manner Never Clearly Disclosed To Plaintiffs ........... 15

        3.   Defendant's Account-Opening Disclosures Were Not "Clear And Conspicuous" Because They Were Misleading Or Ambiguous From The Perspective Of The Reasonable Consumer ................................................................................................ 21

    C.   The Court Should Sustain Plaintiffs' Alternative Pleading (Count IV) At This Early Stage ................................................................................................................. 22

VI.    CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Accusoft Corp. v. Quest Diagnostics,*
   Civ. No. 12-40007-TSH, 2015 WL 7242151 (D. Mass. July 24, 2015)................................. 11

*Aspen Advisors LLC v. United Artists Theatre Co.,*
   861 A.2d 1251 (Del. 2004) ...................................................................................... 9, 10

*Begala v. PNC Bank, Ohio, N.A.,*
   163 F.3d 948 (6th Cir. 1998) ........................................................................................ 19

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)........................................................................................................ 5

*C.F.T.C. v. McDonnell,*
   287 F.Supp.3d 231 (E.D.N.Y. 2018) ........................................................................ 5, 11, 16

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d. Cir. 2002)........................................................................................... 6

*Chase Bank USA, N.A. v. McCoy,*
   562 U.S. 195 (2011)............................................................................................ 14, 17, 19

*Ford Credit Co. v. Milholli,*
   444 U.S. 555 (1980).................................................................................................. 18, 20

*GMG Capital Inv., LLC v. Athenian Venture Partners I, L.P.,*
   36 A.3d 776 (Del. 2012) ................................................................................................ 7

*Haft v. Dart Grp. Corp.,*
   841 F.Supp. 549 (D. Del. 1993)..................................................................................... 20

*Hauk v. JP Morgan Chase Bank USA,*
   552 F.3d 1114 (9th Cir. 2009) ........................................................................................ 3

*Hubbard v. Fidelity Federal Bank,*
   91 F.3d 75 (9th Cir. 1996) ............................................................................................. 3

*In re Whitley,*
   772 F.2d 815 (11th Cir. 1985) .................................................................................. 14, 21

*Kuhn Const., Inc. v. Diamond State Port Corp.,*
   990 A.2d 393 (Del. 2010) ............................................................................................... 8

*Lifanda v. Elmhurst Dodge, Inc.,*
   237 F.3d 803 (7th Cir. 2001) ........................................................................................ 16

*Lorillard Tobacco Co. v. American Legacy Foundation*,
   903 A.2d 728 (Del. 2006) ............................................................................ 7

*Nat'l Credit Union Admin Bd. v. U.S. Bank Nat'l Assoc.*,
   898 F.3d 243 (2d. Cir. 2018) ....................................................................... 6

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ..................................................................................... 5

*Osborne ex rel. Osborne v. Kemp*,
   991 A.2d 1153 (Del. 2010) ..................................................................... 8, 10

*Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*,
   297 A.2d 28 (1972) ..................................................................................... 20

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir. 1996) ...................................................................... 11

*Roth v. Jennings*,
   489 F.3d 499 (2d. Cir. 2007) ....................................................................... 6

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ............................................................... 14, 21

*Smith v. Cash Store Mgmt., Inc.*,
   195 F.3d 325 (7th Cir. 1999) ........................................................... 13, 21, 22

*Smith v. Fidelity Consumer Discount Co.*,
   898 F.2d 896 (3d. Cir. 1990) ...................................................................... 19

*Staehr v. Hartford Fin. Srvcs. Grp., Inc.*,
   547 F.3d 406 (2d. Cir. 2008) ....................................................................... 6

*Swanson v. Bank of America, N.A.*,
   566 F.Supp.2d 821 (N.D. Ill. 2008) ...................................................... 14, 17

*Szumny v. American General Finance*,
   246 F.3d 1065 (7th Cir. 2001) ...................................................................... 1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 6

*Watts v. Key Dodge Sales, Inc.*,
   707 F.2d 847 (5th Cir. 1983) ................................................................. 14, 21

*Williams v. Washington Mut. Bank*,
   No. CIV. 07-2418, 2008 WL 115097 (E.D. Cal. Jan. 11, 2008) ................. 15, 17, 19

**Statutes**

15 U.S.C § 1632 ................................................................................................ 16

15 U.S.C. § 1610 ................................................................................................. 1

15 U.S.C. § 1637 ................................................................................. 15, 24, 27

**Regulations**

12 C.F.R. § 1026.5 ................................................................................. 18, 20, 23

12 C.F.R. § 1026.9 ................................................................................. 16, 18, 20

12 C.F.R. §§ 1026.8 .......................................................................................... 23

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)........................................................... 11

H.R.Rep. 111-88, 1, 2009 U.S.C.C.A.N. 453 ................................................... 2

H.R.Rep. No. 1040 (1967), *as reprinted in* 1968 U.S.C.C.A.N. 1962, 1963 ............................... 24

November 14, 2018 Testimony of Hon. Randal Quarles, Vice Chairman for Supervision, Board of Governors of the Federal Reserve System, "Semi-Annual Testimony on the Federal Reserve's Supervision and Regulation of the Financial System," House Financial Services Committee.................................................................................. 11

S.Rep. No. 392 (1967) ...................................................................................... 24

## I.    INTRODUCTION

The crux of Plaintiffs' First Amended Complaint (Dkt. 30) ("Complaint") is that the parties did not agree, and Defendant did not disclose, that Cash Advance charges would apply to buying so-called "cryptocurrencies" with a Chase credit card.

There is no dispute that when Plaintiffs used their credit cards to buy cryptos after January 23, 2018, they did not know that Cash Advance charges would apply to those transactions.  There is no dispute that Plaintiffs' lack of knowledge proximately caused them to incur substantial fees and interest charges, which they would not otherwise have incurred.  The core question presented by this case is whether Plaintiffs' lack of knowledge was reasonable, or unreasonable, from the perspective of the ordinary consumer.  Based on the totality of facts alleged, the Court should not hold as a matter of law that Plaintiffs' lack of knowledge was unreasonable.  Accordingly, as thoroughly explained below, the Court must deny Defendant's motion to dismiss.

## II.    LEGAL BACKGROUND

Before the Court analyzes Plaintiffs' TILA and breach of contract claims, the Court should assess the interplay (if any) between these two independent bodies of law: the common law of contracts, and the statutory law of TILA and Regulation Z.

One the one hand, Plaintiffs' written contracts with Defendant (Dkt. 30-1) are ordinary common law contracts, governed by state law.  TILA and Regulation Z do not displace state contract law, even when it comes to credit card agreements. 15 U.S.C. § 1610 ("[T]his subchapter and the regulations issued thereunder do not affect the validity or enforceability of any contract or obligation under State or Federal law."); *Szumny v. American General Finance*, 246 F.3d 1065, 1070 (7th Cir. 2001) ("A creditor's substantive rights are still governed by state law; federal law merely classifies those rights for disclosure purposes.").  As a matter of contract, the Court must

assess whether state law principles of contract interpretation permitted Defendant to impose "Cash Advance" charges against Plaintiffs for buying cryptos.  If state contract law would prohibit these charges, then TILA and Regulation Z are utterly powerless to permit them.

On the other hand, Plaintiffs' written contracts with Defendant are more than mere common law contracts; they also contain federally mandated financial disclosures.  TILA and Regulation Z affirmatively require certain types of financial disclosures from credit card issuers to cardholders: disclosures that state contract law might *not* require.  Specifically, with respect to changes in financial terms, TILA's legislative history reflects that "[m]ost, if not all, [credit card] *agreements* allow the issuer to change the interest rate or other [financial] terms at any time for any reason."  H.R.Rep. 111-88, 1, 2009 U.S.C.C.A.N. 453, 455 (emphasis added).  Yet Congress, in enacting TILA, found that such open-ended *contractual* provisions inhibit consumers' "informed us of credit."  *Id.* ("These [contractual] provisions allow the card issuer, after a consumer has agreed to the terms of a credit card account and used the card to make purchases or cash advances, to rewrite the agreement or demand a higher rate of interest . . . .");  *see also* 15 U.S.C. § 1601(a) (Congressional findings and declaration of purpose, concerned with ensuring consumers' "informed use of credit").  Congress thus enacted TILA's "Subsequent disclosure" provision to notify cardholders in advance of certain changes in *credit* terms (*i.e.,* financial terms), even where the issuer may be *contractually* entitled to impose new financial terms without notice.

The interplay of these independent bodies of law — state contract law and TILA-mandated disclosures — results in four possible outcomes in any credit card relationship.  *First*, an issuer may abide by its contract under state law, and make all required disclosures under TILA, thus complying with both bodies of law.  *Second*, the creditor may breach its contract under state law, and also fail to satisfy its statutory disclosure requirements under TILA, thus offending both laws

simultaneously.  *E.g., Hubbard v. Fidelity Federal Bank*, 91 F.3d 75, n.3 (9th Cir. 1996) ("We do not agree with the district court's view that [plaintiff's] breach of contract and TILA claims are mutually exclusive").  *Third*, a creditor may abide by its contract under state law, yet fail to make required disclosures under TILA (as illustrated in TILA's legislative history, *supra*).  *Fourth*, a creditor may breach its contract without offending TILA: for example, if the creditor acts contrary to a contractual term for which TILA and Regulation Z do not require accurate disclosure.  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1120 (9th Cir. 2009) (explaining that "the breach of a credit card agreement based on conduct independent of the disclosures does not necessarily give rise to a TILA claim").

Here, the second possible outcome applies.  As explained herein, Defendant could plausibly be found liable under both Plaintiffs' TILA claims and Plaintiffs' breach of contract claims.  *Cf. Hubbard*, 91 F.3d at n.3.

## III.   STATEMENT OF FACTS

Defendant is a national bank and credit card issuer. ¶16.[1]  Plaintiffs are consumers and Chase credit cardholders.  ¶¶13-15.  When Defendant opened Plaintiffs' credit card accounts in 2017, Defendant sent each Plaintiff a form credit card agreement, which contained mandatory "account-opening disclosures" under TILA and Regulation Z.  ¶¶36-40; *see also* Dkt. 30-1.

The agreement and disclosures provided that "Purchase" charges would apply when Plaintiffs "use [their] account[s] to buy goods and services."  *Id.*  They further provided that "Cash Advance" charges would apply to "Cash-like Transactions."  *Id.*  Defendant defined the term "Cash-like Transaction" to mean "purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions."  *Id.*

---

[1] All references to "¶_" refer to paragraphs in Plaintiffs' First Amended Complaint (Dkt. 30).

Plaintiffs and the putative Class repeatedly used their credit cards to buy so-called "cryptocurrencies."    ¶¶47-55.   Cryptocurrencies (sometimes called "cryptos" or "virtual currencies") are arbitrary computer codes outputted by "blockchain" software programs. ¶¶20-31, 45-46.   "[V]irtual currencies and their blockchain systems are fundamentally private sector technologies, computer codes, and software applications."  ¶31.  Some of the more popular cryptos today are "Bitcoin," "Litecoin," "Ethereum," and "Ripple"; each has a different technological function. ¶¶23-29. For example, Bitcoin and Litecoin allow people to "create and transfer 'coins' [*i.e.,* arbitrary computer codes, also called "message digests"] to each other based on an open source, cryptographic protocol."  *Id.*  By contrast, Ethereum, is a crypto-blockchain tandem that facilitates the creation and maintenance of so-called "smart contracts."  *Id.*  Smart contracts are computer programs capable of managing agreements between users of Ethereum software.  *Id.*

Virtual currencies are *not* monetary in nature or origin. ¶¶30-31, 45-46.  They are not legal tender, and do not represent claims on legal tender. *Id.* Virtual currencies do not originate from the government, a central bank, or any financial institution.  *Id.*  The government does not accept them as payment for taxes or other obligations.  *Id.*  "The overwhelming majority of private businesses and individuals will also not accept payment for the sale of goods, services, or real or financial assets in 'virtual currency.'"  *Id.*  No government or financial institution has oversight or control of the creation or distribution of cryptos among private persons.  *Id.*  There is no centralized authority to validate ownership or transfers of cryptos.  *Id.*

Instead, anonymous computer programmers have invented, sold, and managed different types of cryptos over the last nine years.  *Id.*  Private computer programmers invent cryptos *at will*, and private computer programmers "can and do change the nature, function and ownership of cryptos on the fly." *Id.*  The U.S Internal Revenue Service deems cryptos to be a form of personal

"property" (not "currency"), and at least one federal judge has found that cryptos constitute "goods" as a matter of law. ¶31; *C.F.T.C. v. McDonnell*, 287 F.Supp.3d 231, 228 (E.D.N.Y. 2018).

Plaintiffs at all times reasonably believed that buying cryptos with their credit cards constituted a Purchase of "goods" under their written contracts. ¶¶47-59. And from 2016 until January 23, 2018, Defendant affirmatively charged and disclosed Plaintiff's and the Class's crypto purchases as "Purchases" under their written contracts.  ¶¶6, 47-59.

But when Plaintiffs made additional crypto purchases between January 23, 2018 and February 2, 2018 (inclusive), Defendant charged *those* purchases as "Cash Advances," without prior notice to Plaintiffs.  *Id.*  Had Defendant disclosed this material change to Plaintiffs before they undertook to make their latest crypto purchases, Plaintiffs would never have used their Chase credit cards to make those purchases.  *Id.*  As a result of Plaintiffs' lack of notice, Plaintiffs incurred substantial Cash Advance fees and interest charges they would not otherwise have incurred. *Id.* Defendant knew that it had long disclosed and charged crypto purchases to cardholders as Purchases, but "affirmatively declined to notify cardholders of this important change."  *Id.*

## IV.   MOTION TO DISMISS STANDARDS

### A.   General Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  At this stage, Plaintiff is entitled to "the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.*; *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.").  At this stage, the Court must "accept as true the factual allegations of the complaint and draw inferences based upon these allegations in the light most

favorable to the plaintiffs." *Nat'l Credit Union Admin Bd. v. U.S. Bank Nat'l Assoc.*, 898 F.3d 243, 252 (2d. Cir. 2018).

**B.    Defendant's Reliance On The "Satoshi" White Paper And Other Extraneous Sources Is Procedurally Improper At This Pleading Stage**

Outside the four corners of a complaint, there is only a limited set of materials that courts can consider on a Rule 12(b)(6) motion.  The Second Circuit has "reiterate[d]" that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d. Cir. 2002); *accord* Dkt. 40 at n.5.  Accordingly, courts may only consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  Pivotally, however, if courts take judicial notice of extraneous documents on a motion to dismiss, courts *cannot* accept the documents' contents as true; instead, courts can only notice that extraneous documents say what they say.  *Roth v. Jennings*, 489 F.3d 499, 511 (2d. Cir. 2007) ("[S]uch documents may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents."); *Staehr v. Hartford Fin. Srvcs. Grp., Inc.*, 547 F.3d 406, 425 (2d. Cir. 2008) ("We have previously held that it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard for the truth of their contents . . . .") (collecting cases).  Defendant's motion improperly invites the Court to disregard this crucial procedural rule.

For example, in a barrage of footnotes and bullet points, Defendant's motion relies upon the contents of a "Bitcoin" white paper, and other extraneous sources, to try to establish the factual conclusion that cryptos are "like" cash. *E.g.,* Dkt. 40 at n.1 (relying on the contents of bitcoin.org); *id.* at n.6 (relying on the contents of someone's research paper); *id.* at n.7, n.8 (relying on assertions

from a different research paper); *id.* at n.12 (relying on the contents of imf.org); *id.* at n.15 (contents of bitcoin.org); *id.* at n.16 (contents of bitcoin.com); *id.* at n.18 (relying on the contents of various news websites); *id.* at 12-13 (relying on the contents of other websites).   The Court cannot permit Defendant to bombard it with internet articles, which are not even admissible at trial, to establish conclusive facts at the motion to dismiss stage.   For every website Defendant cites, Plaintiffs could (but won't) easily cite opposing websites.   The Court must disregard Defendant's improper flurry of internet-based factual contentions at this stage.

## V.     ARGUMENT

### A.     As A Matter Of Contract, The Parties Agreed That Buying "Virtual Currency" Would Constitute A "Purchase" Transaction

Delaware law governs the parties' agreement. Dkt. 30-1 at 12 (docket pagination).   Under Delaware law, "the role of a court is to effectuate the parties' intent."   *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).   "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *GMG Capital Inv., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

Here, the written contract provides that "Purchase" charges apply to "buy[ing] goods and services."   ¶¶37-39.   "Cash Advance" charges, on the other hand, apply to "obtain[ing] *cash* from automatic teller machines, at banks or by using cash advance checks.   Unless we say otherwise, balance transfer checks or promotional checks . . . will be treated as cash advances."   *See id.*   As used in this provision, the term "cash" clearly refers to actual money: namely, U.S. dollars or perhaps some foreign currency.   The language, however, further states that Defendant will "treat certain other transactions as cash advances.   See the Cash-like Transactions section under Important Definitions above."   *Id.*   In turn, the "Important Definition" for "Cash-like Transactions"

provides that, "[t]he following transactions will be treated as cash advances: purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions." *Id.*

Defendant's motion argues that purchasing a crypto constitutes a "Cash Advance" under these provisions because (Defendant counter-alleges) cryptos are generally "like" cash. *E.g.,* Dkt. 40 at 11 ("The term 'cash-like transaction' includes cryptocurrency transactions because cryptocurrency is 'like' cash."). For several reasons, Defendant's generalized "cash-like" argument must fail here.

Importantly, Defendant's argument contradicts multiple canons of contract construction under Delaware law. One is the canon against surplusage, under which courts must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010). Defendant's interpretative conclusion here is inconsistent with the canon against surplusage. Indeed, the contract does *not* say that Cash Advance charges apply to purchasing anything that might be *generally* "like" cash. The contract instead carefully defines the term "Cash-like Transaction," using an "Important Definition." Defendant's reading of the contract would leave this "Important Definition" without any legal effect. Under Defendant's view, the term "Cash-Like Transaction" could be left wholly *undefined* to arrive at the same hyper-broad meaning Defendant now ascribes to the term. But as a matter of law, the contract's "Important Definition" must have some meaningful, additional effect on the parties' relationship. *Osborne ex rel. Osborne v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) ("We will not read a contract to render a provision or term meaningless or illusory."). Defendant's generalized "cash-like" construction contemplates no such effect, and thus undermines the canon against surplusage.

8

Defendant's generalized "cash-like" argument also undermines the contractual canon of *ejusdem generis*, which holds that "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, *general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned*." *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004) (emphasis added). The contract in this case enumerated as "cash-like" four specific things "of a particular and specific meaning" — travelers checks, foreign currency, money orders, and wire transfers — immediately followed by the more general language of "similar cash-like transactions." Accordingly, under the canon of *ejusdem generis*, the term "cash-like transactions" must be held to apply only to "things of the same kind or class" as travelers checks, foreign currency, money orders and wire transfers.

Plaintiffs' Complaint alleges facts showing why the enumerated "cash-like" items are relatively "similar" to each other, while being relatively dissimilar to cryptos. For instance, the Complaint points out that each of the contract's enumerated "cash-like" items constitutes actual money, or a direct claim on actual money. ¶¶17-19; 41-44. Each enumerated "cash-like" item is also generally accepted as a form of financial payment: not only by governments, but also by private producers of goods, services, and real and financial assets. *Id.* This is because such formal monetary instruments are backed and issued by governments and financial institutions; they have *face monetary values tied directly to the legal tender paid to issue them*. *Id.* None are inventions to be coded into computers at the whims of stray humans; they are instead societally accepted payments created only by governments and regulated institutions: by operation of law.

By contrast, "virtual currencies" are *not* legal tender, nor do they represent claims on legal tender (or claims on anything at all). ¶20. Unlike the enumerated "cash-like" items, cryptos are

not accepted as payment by governments, or by the "overwhelming majority of private businesses and individuals . . . for the sale of goods services, or real or financial assets." ¶21. This is true for many reasons, including but not limited to: (1) virtual currencies are, in fact, arbitrary computer codes derived from privately managed software programs; (2) anyone capable of programming a computer can invent a new crypto at will; and (3) like any computer program, *existing* cryptos can be fundamentally altered by their programmers at will. *See generally* ¶¶20-31; 45-46. At bottom, "[w]hatever their 'coin'-sounding names might portend, virtual currencies and their blockchain systems are fundamentally private-sector technologies, computer codes, and software applications." ¶31. For all of the above reasons, cryptos simply are not "similar" in "kind or class" to Defendant's enumerated "cash-like" items. *Aspen Advisors*, 861 A.2d at 1265.

Under Delaware law, the Court must also consider the canon of *contra proferentem*, which requires courts to interpret contractual ambiguities "against the drafting party and interpret the contract in favor of the non-drafting party." *Osborne*, 991 A.2d at 1160. While the parties' mere disagreement about a term does not establish ambiguity, an ambiguity exists where a court "may reasonably ascribe multiple and different interpretations to a contract." *Id.* Here — at worst for Plaintiffs — the Court could reasonably ascribe more than one interpretation of the parties' written contract as applied to cryptos.

On the one hand, the contract provides that "Purchase" charges apply to "buy[ing] goods and services." ¶¶37-39. Plaintiffs properly allege that virtual currencies are arbitrary computer codes created, recorded and transmitted between private users of so-called "blockchain" software. *See* ¶¶20-31; 45-46. Anyone with sufficient computer programming aptitude can invent a virtual currency, as one might invent a video game or any other type of software. *Id.* At least one federal court to have addressed the issue has reasonably determined that cryptos constitute "goods" within

the plain meaning of the word "goods." *McDonnell*, 287 F.Supp.3d at 228 ("Virtual currencies are 'goods' exchanged in a market for a uniform quality and value."); *cf. ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451-53 (7th Cir. 1996) (treating the sale of computer software as a sale of "goods," subject to the Uniform Commercial Code); *Accusoft Corp. v. Quest Diagnostics*, Civ. No. 12-40007-TSH, 2015 WL 7242151, at *4 (D. Mass. July 24, 2015) (noting that courts have found software to constitute "goods" under the Uniform Commercial Code), *report and recommendation adopted*, 2015 WL 7265916 (D. Mass. Sep. 28, 2015); *see also* Black's Law Dictionary (10th ed. 2014) (defining "Goods" as "[t]angible or moveable personal property *other than money*") (emphasis added).  Because virtual currencies are reasonably characterized as "goods," it is — at the very least — reasonable for Plaintiff to interpret the parties' contract to mean that buying virtual currencies constitutes a "Purchase" transaction.

Defendant counter-alleges (improperly at this stage) that cryptocurrencies have, or were intended to have, certain "cash-like" characteristics.  But the mere intentions of various crypto inventors are hardly relevant, let alone dispositive, here.  Moreover, Plaintiffs' Complaint details numerous characteristics of cryptos that are dissimilar to money and to Defendants' enumerated "cash-like" instruments.  *See generally* Part III, *supra*.[2]  In this regard, Plaintiffs' interpretation is not so "absurd" as to render it "unreasonable" as a matter of law.  *Osborne*, 991 A.2d at n.21

---

[2] *See also* November 14, 2018 Testimony of Hon. Randal Quarles, Vice Chairman for Supervision, Board of Governors of the Federal Reserve System, "Semi-Annual Testimony on the Federal Reserve's Supervision and Regulation of the Financial System," House Financial Services Committee, *available at* https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=404059 (2:06:10) ("So, currently the characteristics of all of those cryptocurrencies would not really lead one to consider them money yet. They really aren't money yet. They're an asset. In fact, internationally, we've taken to calling them "cryptoassets" as opposed to "cryptocurrencies." They're an asset that has been highly volatile in price, which makes them less appealing even as a store of value and certainly not as a payments mechanism.").

(collecting cases).  At worst for Plaintiffs, an ordinary contractual ambiguity exists here, and the canon of *contra proferentem* applies in Plaintiffs' favor as the non-drafting parties.

Additionally, to the extent that some reasonable ambiguity exists here in the "meaning and application" of the written contracts, the Court should "consider the evidence offered in order to arrive at a proper interpretation of contractual terms." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997).  Such evidence includes "evidence of prior agreements and communications of the parties as well as trade usage or *course of dealing*." *Id.* (emphasis added).  The parties' pleadings here show their respective intents to offer competing evidence, to have the trier of fact resolve any "cash-like" ambiguity in their favor.  Plaintiffs intend to offer prior account statements from Defendant, showing a substantial course of dealing in which the parties repeatedly deemed crypto purchases to be "Purchase" transactions under the contracts.  Plaintiffs will also offer admissible evidence regarding the technological, non-monetary nature of cryptos.  Based on its filings to date, Defendant intends to offer rebuttal evidence regarding allegedly "cash-like" characteristics of cryptos.

The Court can properly evaluate the parties' competing evidence at summary judgment.  Under Delaware law, however, the Court cannot find on Defendant's instant motion that the parties expressly agreed to treat crypto purchases as "Cash-like Transactions," rather than Purchases of "goods."  In fact, Defendant's motion makes no argument that cryptos do *not* constitute "goods."  *See generally* Dkt. 40.  For all of the above reasons, there is at least an ambiguity here, and the Court should thus deny Defendant's motion to dismiss Plaintiffs' breach of contract claims.

### B.   Defendant Never Clearly Disclosed That Buying "Virtual Currency" Would Constitute A "Cash Advance" Transaction

#### 1.   The Purpose And Statutory Structure Of TILA's Disclosure Requirements

In enacting TILA:

> The Congress [found] that economic stabilization would be enhanced . . . by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of [TILA] to assure a meaningful disclosure of credit terms so that the consumer will be able to . . . avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a). As relevant here, there are two main ways in which TILA promotes "awareness of the cost [of credit] by consumers." *Id.*

The *first* is through mandatory "account-opening disclosures," which require issuers to disclose certain financial terms to cardholders at the outset of the parties' relationship. *See* 15 U.S.C. § 1637(a). These account-opening disclosures are required regardless of whether state contract law would require particular financial terms to be specified in writing. *See* Part II, *supra*. Pursuant to its statutory authority, the Consumer Financial Protection Bureau ("Bureau") has promulgated authoritative rules, which elaborate upon the account-opening disclosures required by 15 U.S.C. § 1637(a). *See generally* 12 C.F.R. § 1026.6(b). Bureau-mandated "account-opening disclosures" include, among other things: the interest rates that apply to the account (12 C.F.R. § 1026.6(b)(2)(i)); any "[t]ransaction charges" that apply (12 C.F.R. § 1026.6(b)(2)(iv)); any "[c]ash advance fee" that applies (12 C.F.R. § 1026.6(b)(2)(vii)); and, importantly, "the [t]ype of transaction to which [an interest] rate applies, if different rates apply to different types of transactions" (12 C.F.R. § 1026.6(b)(4)(i)(C)).

TILA and Regulation Z require the above "account-opening disclosures" to be made "clearly and conspicuously." 15 U.S.C § 1632(a). An account-opening disclosure is not "clear and conspicuous" if it is misleading, or ambiguous, in the eyes of a reasonable consumer. *Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 328 (7th Cir. 1999) (denying motion to dismiss where plaintiff alleged TILA-mandated disclosures were "confusing or misleading" from the perspective

"of an ordinary consumer"); *Rubio v. Capital One Bank*, 613 F.3d 1195, 1202 (9th Cir. 2010) ("[I]t is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *Watts v. Key Dodge Sales, Inc.*, 707 F.2d 847, 852 (5th Cir. 1983) ("At the very least, the provision is ambiguous, thus violating the TILA [and] Regulation Z."); *In re Whitley*, 772 F.2d 815, 817 (11th Cir. 1985) ("[T]hese divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation Z.").[3]   In sum, TILA and Regulation Z first require that particular financial terms be "clearly and conspicuously" disclosed to cardholders at the outset of the parties' relationship.

The *second* way that TILA promotes "awareness of the cost [of credit] by consumers" is by requiring an issuer's disclosures to reflect the actual financial terms applied to the account at all times *after* account-opening.  This is the purpose of TILA's "change-in-terms" provision; it requires issuers to pre-disclose any "significant" changes to a cardholder's financial terms that might occur later in the parties' relationship.  If these post-account-opening financial changes — and their causal "triggers" — are accurately disclosed up front in the account-opening disclosures, then TILA requires no change-in-terms notice if those *pre-disclosed* financial changes later take effect.  *E.g., Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198-200 (2011) (a change-in-terms notice is unnecessary only if "the specific change is set forth initially" in the issuer's account-opening disclosures); *Swanson v. Bank of America, N.A.*, 566 F.Supp.2d 821, 825-26 (N.D. Ill. 2008) (subsequent notice required where account-opening disclosures allow the issuer to change financial terms, but do not specify circumstances that will "trigger" such changes); *Williams v.*

---

[3] It is this anti-ambiguity mandate of TILA and Regulation Z which requires Defendant to actually define the terms "Purchase" and "Cash Advance" in the first place; creditors may not simply disclose that "the interest rate for *purchases* is X%, and the interest rate for *cash advances* is Y%," and say nothing more, because such ambiguous words would not "clearly" disclose "[t]he types of transactions to which [each] rate applies." 12 C.F.R. § 1026.6(b)(4)(i)(C).

*Washington Mut. Bank*, No. CIV. 07-2418, 2008 WL 115097, at \*2-3 (E.D. Cal. Jan. 11, 2008) (same).  If, however, post-account-opening financial changes, and their causal "triggers," are *not* specifically disclosed up front in the account-opening disclosures, then TILA requires a subsequent notice to cardholders before implementing such changes on the account.  *See id.*

> **2.  Defendant Violated TILA Because It Changed "The Types Of Transactions" To Which Cash Advance Rates Applied, In A Manner Never Clearly Disclosed To Plaintiffs**

At the time of account-opening, and also throughout the parties' creditor-borrower relationship, TILA and Regulation Z required Defendant to accurately (and unambiguously) disclose the following financial terms, among others:

- the interest rate(s) that apply to outstanding balances (12 C.F.R. § 1026.6(b)(2)(i));

- any "[t]ransaction charges" that apply to purchases (12 C.F.R. § 1026.6(b)(2)(iv));

- any "[c]ash advance fee[s]" that will apply to the account (12 C.F.R. § 1026.6(b)(2)(vii); and

- "the type of transaction to which [an interest] rate applies, if different rates apply to different types of transactions" (12 C.F.R. § 1026.6(b)(4)(i)(C)).

*See generally* 12 C.F.R. § 1026.6 (requiring all of the above financial terms to be accurately and unambiguously disclosed in "account-opening disclosures"); *see also* 12 C.F.R. § 1026.9(c)(2) (requiring "Subsequent disclosure" of changes to any of the above financial terms on the "account," after account-opening disclosures are made).

Here, from the perspective of an ordinary consumer, Defendant's charging of "Cash Advance" rates for crypto purchases were *not* clearly or accurately pre-disclosed: not at the time of account-opening, and not after the time of account-opening.  At account-opening, Defendant provided Plaintiffs with the following disclosures concerning the "types of transactions" to which the respective Purchase and Cash Advance rates would apply.  The Purchase rate would apply to

"buy[ing] goods and services."  ¶¶37-39.  The Cash Advance rate would apply to buying "travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions."  *Id.*

As detailed in the Complaint and in Parts III and V.A, *supra*, reasonable consumers could conclude that virtual currencies constitute "goods," as opposed to "similar cash-like transactions." *McDonnell*, 287 F.Supp.3d at 228 (recognizing that virtual currencies are "goods").  This is because, *inter alia*: (1) cryptos are, in fact, arbitrary computer codes derived from privately managed software programs (¶¶15-29); (2) cryptos are technological in nature, not monetary in nature (*id.*); (3) anyone capable of programming a computer can invent a crypto, but cannot invent a U.S. dollar or British pound (*id.*); (4) like any computer program, cryptos can be fundamentally altered by their programmers on the fly (*id.*); (5) there is no centralized authority to validate transfers or ownership of cryptos (*id.*); and (6) cryptos are not generally accepted as payment mechanisms in the broader economy.  Part III, *supra*.

Consequently, Defendant's account-opening disclosures reasonably suggested that "Purchase" rates would apply to buying cryptos with a Chase credit card.  *See Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 806 (7th Cir. 2001) (when evaluating whether an issuer's disclosures are inaccurate, misleading, or ambiguous, courts must evaluate "from the standpoint of an ordinary consumer, not the perspective of a Federal Reserve Board member, federal judge, or English professor").  If there could be any reasonable doubt, Defendant itself eliminated room for doubt by repeatedly charging *and disclosing* Plaintiffs' crypto purchases as "Purchases" within the meaning of its own account-opening disclosures.  Thus, before January 23, 2018, Defendant's account-opening disclosures — and affirmative conduct thereunder — clearly suggested to reasonable consumers that "Purchase" rates would apply to these "types of transactions."  12 C.F.R. § 1026.6(b)(4)(i)(C).

16

However, beginning in January 2018, Defendant manifestly changed the "types of transactions" to which its Purchase and Cash Advance rates applied.  *See, e.g.,* Dkt. 1-1; Dkt. 1-2. The Purchase rate (X%) had long applied to crypto purchases under Defendant's account-opening disclosures, but suddenly the Cash Advance rate (Y%) would start applying to crypto purchases. So on January 23, 2018, Defendant manifestly changed "the types of transactions to which the [26%+ Cash Advance] rate applies."  12 C.F.R. § 1026.6(b)(4)(i)(C). And crucially, Defendant made this financial change in a manner *not specifically pre-disclosed* to Plaintiffs in Defendant's account-opening disclosures.  *McCoy*, 562 U.S. at 198-200; *Swanson*, 566 F.Supp.2d at 825; *Williams*, 2008 WL 115097, at *2-3.  Hence, Plaintiffs were entitled to a subsequent disclosure under TILA: after account-opening.

Even assuming, *arguendo*, that Defendant made this post-opening financial change "under [its] contract reservation of right" to apply the Cash Advance rate to new types of transactions "from time to time," even "without amendment," such a broad reservation of right was clearly insufficient under TILA to inform Plaintiffs of the "specific change" that would occur here.  *See* Dkt. 30-1 at 4 (docket pagination) (contract providing that "APRs or other terms may also change *without amendment* . . . .") (emphasis added); *Swanson*, 566 F.Supp.2d at 825 ("[N]otice must be given if the contract allows the creditor to [make the change] at its discretion but does not include specific terms for [the change].").  TILA and Regulation Z thus required Defendant to notify Plaintiffs that the Cash Advance rate would suddenly begin applying to their crypto purchases, effective January 23, 2018. *See* Supplement I, 12 C.F.R. § 1026.9(c)(2), comment 1. (explaining that "notice must be given [even] if the [initial] contract allows the creditor to [change a "significant account term"] at its discretion."); 12 C.F.R. § 1026.5(e) ("If a disclosure becomes inaccurate *because of an event that occurs* after the creditor mails or delivers the disclosures, the

17

resulting inaccuracy is not a violation of this part, *although new disclosures may be required under § 1026.9(c)*.").

The Court must reject Defendants' flawed arguments to the contrary.  Defendant moves to dismiss Count III on the ground that TILA's and Regulation Z's "change-in-terms" provisions do not apply absent "a change in an actual provision of the credit-card contract."  Dkt. 40 at 7; *id.* at 10 ("In sum, the advance-notice requirement is triggered only by a change in the actual terms of the credit card account agreement."); *id.* at 6 (Defendant arguing that Count III fails as a matter of law "because Plaintiffs do not and cannot allege that Chase changed any written term of their Chase CMAs").  In effect, Defendant argues in circular fashion that its written disclosures of Plaintiffs' financial terms need not change because Defendant's written disclosures of Plaintiffs' financial terms never changed.  This argument defies common sense, and contradicts the plain, authoritative text of Regulation Z.  *See* 12 C.F.R. § 1026.5(e) ("If a disclosure becomes inaccurate *because of an event that occurs* after the creditor mails or delivers the disclosures, the resulting inaccuracy is not a violation of this part, *although new disclosures may be required under § 1026.9(c)*.") (emphasis added).  As seen in 12 C.F.R. § 1026.5(e), Regulation Z expressly contemplates that a "change-in-terms" notice may be necessary where the account-opening disclosures have *not* been amended or changed in any respect.  The Bureau's formal interpretations of TILA and Regulation Z are authoritative here.  *Ford Credit Co. v. Milholli*, 444 U.S. 555, 568 (1980) ("[J]udges ought to refrain from substituting their own interstitial lawmaking for that of the [Bureau], so long as the latter's lawmaking is not irrational.").  Notifying cardholders in advance of the "event" of particular financial charges is precisely what ensures consumers' "informed use of credit" under TILA.  15 U.S.C. § 1601(a).

Otherwise, *all issuers* could perpetually avoid the requirement to notify cardholders of "significant" financial changes, *simply by declining to amend their initial disclosures*.  Such a nonsensical interpretation of TILA and Regulation Z would leave consumers without any financial protection.  *But see Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998) ("We have repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer.").  *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 898 (3d. Cir. 1990) ("TILA, as a remedial statute which is designed to balance the scales thought to be weighed in favor of lenders, is to be liberally construed in favor of borrowers.").

Defendant's motion takes completely out of context one stray statement from the Federal Reserve Board — which no longer has interpretive authority under TILA — to argue that TILA's change-in-terms provisions do not apply to finance charges caused by "the application of existing provisions in the cardholder agreement."  Dkt. 40 at 8.  But that isolated statement by the Board was not intended as a license for issuers to capriciously "apply" their written contractual provisions however the issuer wants to "apply" (or "breach") them.  The Board itself said that any change in "application" of contractual terms must *at least* be "consistent with" the written contract in order to obviate the need for notice. *Id.*

The Bureau — which does have interpretative authority under TILA — requires much more than mere "consistency" (*i.e.,* absence of a contradiction) between initial, written contracts, and post-opening financial changes on an account.  The Bureau requires that the "specific change" in financial terms, and any causal "triggers," be clearly and accurately disclosed in the initial disclosure, or in some subsequent disclosure.  *See McCoy*, 566 F.Supp.2d at 825; *Williams*, 2008 WL 115097, at *2-3.  The Bureau's Official Interpretation of 12 C.F.R. § 1026.9 (c)(2) states that "no notice of a change in terms need be given if the specific change is set forth initially . . . ."

Supplement I, 12 C.F.R. § 1026.9(c)(2), comment 1.  "In contrast, notice must be given if the [*unamended*] contract allows the creditor to increase a rate or fee [or change any other "significant" financial term] at its discretion."  *Id.*  Thus, consistent with the text, purposes, and legislative history of TILA, the Bureau expressly and correctly holds that a change in *credit* "terms" may occur without any change in *contractual* "terms" occurring.  *Compare* 15 U.S.C. § 1637(i)(2) (providing that "any significant change" to "the terms . . . of the cardholder agreement" requires advance notice), *with* 12 C.F.R. § 1026.9(c)(2) (interpreting 15 U.S.C. § 1637(i)(2) to require advance written notice of any "significant change in *account terms*," as opposed to changes to a *written agreement* only); *see also* 12 C.F.R. § 1026.5(e) ("If a disclosure becomes inaccurate because of an event that occurs after the creditor mails or delivers the disclosures, the resulting inaccuracy is not a violation of this part, although new disclosures may be required under § 1026.9(c).").  The Bureau's interpretation of TILA and Regulation Z is authoritative here. *Milholli*, 444 U.S. at 568.

For avoidance of doubt, even Delaware contract law recognizes that a change in contractual terms may occur without any change to an initial, *written* agreement.  *E.g., Haft v. Dart Grp. Corp.*, 841 F.Supp. 549, n.23 (D. Del. 1993) ("A 'prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, *including a change in the provisions of the agreement by the course of conduct of the parties.*'") (quoting *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (1972)); *id.* at n.24.  Defendant's own CMA appreciates this aspect of Delaware law, as it expressly provides that the "terms" of the CMA may change "*without amendment*" of the CMA. *See* Dkt. 30-1 at 4 (docket pagination).

For all of the above reasons, Defendant manifestly changed Plaintiffs' and the Class's "account terms" under federal and state law. Defendant was required by TILA and Regulation Z to give Plaintiffs advance notice of this change. Defendant admittedly did not give any such notice, and the Court must therefore deny Defendant's motion to dismiss Count III.[4]

### 3. Defendant's Account-Opening Disclosures Were Not "Clear And Conspicuous" Because They Were Misleading Or Ambiguous From The Perspective Of The Reasonable Consumer

In addition, Defendant's account-opening disclosures violated TILA if they were misleading, or ambiguous, from the perspective of the reasonable consumer. *Smith*, 195 F.3d at 328 ("All TILA disclosures must be accurate . . . , and lenders are generally strictly liable for inaccuracies, even absent a showing that the inaccuracies are misleading."); *Rubio*, 613 F.3d at 1202 ("[I]t is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *Watts*, 707 F.2d at 852 ("At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley*, 772 F.2d at 817 ("[T]hese divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation.").

Defendant argues in conclusory fashion that the written term "similar cash-like transactions" *unambiguously* includes cryptos. Dkt. 40 at 11 (emphasis in original). That argument is simply untrue. For a variety of reasons, reasonable people could conclude that cryptos are *not* "cash-like" items that are "similar" to Defendant's enumerated instruments of monetary payment. *E.g.,* n.2, *supra* (Fed Vice Chair for Supervision, correctly testifying that cryptos are not a real "store of value" and "certainly not" a "payments mechanism"); *see also* Parts III and V.A,

---

[4] Defendant relies on its contractual reservation of right to "enforce" the parties' agreement, to argue that when Defendant merely *billed* these transactions to Plaintiffs as Cash Advances, Defendant was "enforcing" the contract. Dkt. 40 at 9. This argument is meritless. The only parties seeking to "enforce" the contracts here are the Plaintiffs who filed suit.

*supra*; ¶¶20-31, 45-46.  In any event, the reasonable consumer's view of particular disclosures is decidedly a question of fact, not a question of law to be decided on a motion to dismiss.  *Smith*, 195 F.3d at 328 ("Whether or not [defendant's] practices run afoul Regulation Z is a factual issue, and the district court therefore erred in dismissing [plaintiff's] claims under Rule 12(b)(6).").

Here, Plaintiff alleges facts suggesting the reasonable consumer would not interpret the term "similar cash-like transactions" to include cryptos (or any other items or instruments that are non-monetary in nature).  *See generally* Parts III and V.A, *supra*.  Defendant's motion improperly seeks to introduce *competing* factual allegations to argue that reasonable consumers would arrive at a different understanding of the term "similar cash-like transactions," as applied to cryptos.  *E.g.,* Dkt. 40 at 12-13 (citing www.imf.org, www.fatf-gafi.org, and www.fool.com as support for Defendant's "cash-like" factual conclusions).  The Court cannot consider Defendant's competing factual assertions about cryptos at this stage, but if anything, Defendant's factual assertions suggest that (maybe) consumers could arrive at more than one reasonable interpretation of the term "similar cash-like transactions."   Such an ambiguity concerning the "type of transaction" to which Defendant's Cash Advance rate applies violates TILA's clear and conspicuous requirement.

Thus, the Court should deny Defendant's motion to dismiss Count II.

## C.    The Court Should Sustain Plaintiffs' Alternative Pleading (Count IV) At This Early Stage

TILA and Regulation Z required Defendant to send monthly account statements identifying the individual transactions made on Plaintiffs' accounts.  *See generally* 15 U.S.C. § 1637, 12 C.F.R. § 1026.8 (titled "Identifying transactions on periodic statements").  The creditor must properly distinguish between "Sale credits" (*e.g.,* Purchase transactions), and "Nonsale credits" (*e.g.,* Cash Advance transactions).  12 C.F.R. §§ 1026.8(a), 1026.8(b).    The Bureau's official interpretation of § 1026.8(b) is that "[t]he creditor sufficiently identifies a nonsale transaction by

describing the type of advance it represents, *such as [a] cash advance*, loan, [or] overdraft loan."
Supplement I, 12 C.F.R. § 1026.8(b), comment 4 (emphasis added).

Here, Defendant sent Plaintiffs several account statements identifying their November
2017 and December 2017 crypto purchases as "Purchase" transactions (*i.e.,* "Sale credits" under
Regulation Z).  This reasonably led Plaintiffs to believe that their crypto purchases *were* Purchase
transactions, and not Cash Advance transactions, under their credit card agreements.

Defendant, however, avers (wrongly) that it neither breached the written contracts nor
changed Plaintiffs' account terms by charging crypto purchases as Cash Advances (for a mere 10-
day period).  *If* Defendant's arguments somehow prove true, then it would establish that Plaintiffs'
crypto purchases were *always* "Cash Advance" transactions under the written contracts.  TILA
and Regulation Z mandate that all disclosures, including monthly statements, "should reflect the
credit terms to which the parties are legally bound at the time of giving the disclosures." 12 C.F.R.
§ 1026.5(c) (General disclosure requirements).  "The legal obligation is determined by applicable
state or other law," and "normally is presumed to be contained in the contract that evidences the
agreement."  Supplement I, 12 C.F.R. § 1026.5(c), comment 1.

Defendant cannot have it both ways as a factual matter.  It cannot argue that these pre-
January 23 transactions were simultaneously Cash Advance obligations *and* Purchases obligations
under Defendant's contracts.  One way or another, Plaintiffs were reasonably confused and misled
by Defendant's TILA disclosures.  It should ultimately be left to the trier of fact to determine *which*
of Defendant's TILA disclosures were misleading when made; but the answer can't be "none of
them," because Defendant contradicts itself in response to this lawsuit.

Defendant also cannot have it both ways as a matter of law.  It cannot simultaneously argue
that "the credit terms to which the parties are legally bound" are determined solely by the written

23

CMA (Dkt. 40 at 6-7), but also determined by "what Chase at th[e] time required Plaintiffs to pay." Dkt. 40 at 18. This is absurd; there can only be *one* "legal obligation" at a time between the parties under state law. Defendant's motion asks the Court to tip-toe across an illogical minefield of Defendant's making, only to arrive at a factual conclusion that is contrary to common sense.

Defendant's countersense factual conclusion is this: that Plaintiffs' lack of knowledge that they would be hit with Cash Advance charges, beginning January 23, 2018, was somehow *unreasonable*. The Court must respectfully decline Defendant's invitation to conclude, as a matter of law, that Plaintiffs should have known about these Cash Advance charges before incurring them. There was simply no way for Plaintiffs to know. Giving Plaintiffs some form of advance notice would have been easy for Chase here. But for Plaintiffs to have read Chase's corporate mind, as Chase made pivotal business decisions overnight, would have been impossible. *See* S.Rep. No. 392, at 1 (1967) ("The basic purpose of the truth in lending bill is to provide a full disclosure of credit charges to the American consumer."); H.R.Rep. No. 1040 (1967), *as reprinted in* 1968 U.S.C.C.A.N. 1962, 1963 (explaining that TILA "provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended").

## VI.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss on all counts, and allow the trier of fact to determine just how "cash-like" cryptos really are, and what ordinary consumers would have understood their financial obligations to be.[5]

---

[5] Defendant cites no law in support of dismissing Plaintiffs' plea for a declaratory judgment. *See* Dkt. 40 at n.20. The Court should sustain Plaintiffs' claims for a declaratory judgment (Count V) for the same reasons it sustains Plaintiffs' other claims at this stage.

Dated: November 30, 2018                    Respectfully submitted,

                                           FINKELSTEIN & KRINSK LLP


                                           By:  ___s/ David J. Harris, Jr._____
                                                  David J. Harris, Jr., Esq.

                                           550 West C Street, Suite 1760
                                           San Diego, California 92101-3579
                                           Telephone: (619) 238-1333
                                           Facsimile:  (619) 238-5425
                                           Email: djh@classactionlaw.com

                                           *Counsel for Plaintiffs and the Putative Class*